# Law and Equity

IN THE

# SUPRE·ME COURT

OF THE

# STATE OF NEW YORK.

---

CORNELIA J. BERGEN and VICTOR B. BERGEN *vs.* RICHARD A. UDALL and CORNELIUS J. BERGEN.

31b   9
77 AD³350

Where a daughter, immediately upon her arrival at lawful age, makes a voluntary conveyance for the benefit of her father, the transaction will be examined by the court with the most jealous scrutiny and suspicion.

The person relying upon the conveyance must show affirmatively, not only that the one who made it understood its nature and effect, and executed it voluntarily, but that such will and intention was not in any degree the result of misrepresentation or mistake, and was not induced by the exertion for selfish purposes, and for his own exclusive benefit, of the influence or control which the father possessed over his daughter.

There is no law against a child bestowing upon a parent any property, of which she may be the owner, because she loves him, and desires to promote his interests. But there is an inflexible principle both of public policy and private justice which forbids a parent making use of his influence, or his child's affection, to impose upon her mind a purpose of bounty to him.

If the design to make the gift originated in the mind of the child, or was at least unsuggested by any agency of the parent, the act is, as unimpeachable in law as it may be laudable in morals. But if the mind of the donor was

Bergen *v.* Udall.

brought to a purpose preconceived by the parent for his own sole advantage, by an influence which the donor could not escape, in the circumstances in which she was placed, and which is deliberately used to effect such a purpose, then that influence, or its exercise, will be held to have been undue and improper.

In all dealings between parent and child, under such circumstances, the most scrupulous good faith—*uberrima fides*—must be observed; and the weaker party must be put upon an equal footing with the stronger, by a complete disclosure of all material facts, and the abnegation, as far as possible, of any control or dominion, as well as of all mere selfish projects or attempts.

U. being the owner of a tract of land lying on the west side of a certain brook, and the plaintiff, his daughter, an infant under 18 years of age, being the owner of a farm lying opposite, on the east side of the same brook, U. offered to sell to B. a part of his land lying immediately adjoining the brook, but B. refused to purchase the same unless, together with the land, he could secure the right to construct a dam across the stream, so as to pond back the water and overflow the land of the plaintiff. U. thereupon conveyed to B. a part of his said farm lying on the west side of the brook, for the sum of $17,500, together with the right to B. in perpetuity, to construct across said brook a dam five feet in height, and covenanted in the deed, that the plaintiff should, within six months after arriving at the age of twenty-one years, grant and secure to B. in perpetuity the right to construct, maintain and keep the said dam; the sum of $4000, the estimated price or value of the privilege being secured to be paid by B.'s bond and mortgage, payable when the plaintiff should, after arriving at the age of twenty-one, execute a deed of confirmation in respect to such privilege. The plaintiff, by a deed dated the same day the deed from U. to B. was executed, conveyed to B. the right and privilege to make a dam across said brook and thereby to submerge her land. This was done with the advice of her counsel, and with the understanding that she could ratify or disaffirm the act when she should reach the age of twenty-one. When she became of age she made no attempt, and gave no indication of a purpose, to complete the gift. On the contrary, upon an officer coming to her father's house to take her acknowledgment to a conveyance of the privilege, she refused to execute the paper. A week later she again declined executing it. Being subsequently thrown from a wagon she was somewhat hurt, and a good deal frightened. While still unwell and hysterical, her father came to see her, accompanied by Mrs. C. the mother of his second wife, who was selected by U. on account of her supposed influence over the plaintiff. Mrs. C. urged her, strongly, to execute a deed of confirmation; telling her it was her duty to her father to do so, and speaking of his necessities. And, carefully ignoring the plaintiff's own rights and interests, Mrs. C. urged that if she refused to sign the deed, no one would be benefited but B., and that the question for her to determine was whether she would benefit her father, or B. The plaintiff, finally, told U. that if he would secure the sum of $4000, to be paid to her brother

Bergen *v.* Udall.

and sister, at his death, she would confirm the deed. She was informed by U. that he had made a will, and given them more than that amount; and supposing that the $4000 which her compliance would be the means of procuring from B. would be effectually secured to her brother and sister, at her father's death, she at length executed a deed of confirmation.

*Held* that the deed, thus obtained, was not the result of the deliberate, unaided and uncontrolled action of the plaintiff's own mind, but was procured by the agency of means and motives, and the suggestions of others. That it was not to be regarded, and could not therefore be maintained, as an act of pure bounty, proceeding merely from the natural affection of a child for a parent; but was the result of a purpose which she was led by others to form; that the plaintiff was therefore entitled to relief against the deed; and that the same should be set aside, unless U. should pay to her the sum stipulated and agreed upon by B. as the price of the privileges to be conveyed to him by her; or, the fair value of the rights and privileges conferred by her deed of confirmation.

*Held also*, that a deed thus obtained from a grantor, young and inexperienced, not yet emancipated from the matural influence and control of her father, without discreet advisers, whom she could consult, and surrounded by those who were either under the control and influence of her father, or who were actively assisting his purpose and laboring for his interests, the grantor being ill, at the time, could not be sustained; notwithstanding the evidence fell short of showing either gross intentional misrepresentation and fraud, or threats and coercion, on the part of the father.

THE complaint in this case alleged that the plaintiff, Cornelia J. Bergen, was the daughter of the defendant, Richard A. Udall, of his first marriage. That she attained the age of twenty-one years on the 10th day of April, 1857, and was the wife of the other plaintiff, Victor B. Bergen, of the town of Islip, in the county of Suffolk. That the defendant Udall, being the owner of a large tract of land at Islip, lying on the west side of a certain brook called "the Willis brook," and she, the said Cornelia, being the owner and well seised in her own right and estate of a farm lying on the east side of the same brook, which was devised to her in fee by her grandfather, the said Udall offered to sell to the defendant Cornelius J. Bergen a part of his land lying immediately adjoining said brook, but that Bergen refused to purchase the same, unless, together with the land, he could purchase or secure to himself in perpetuity, the right to construct and

maintain a dam at the great south road or highway leading from Babylon to Patchogue, across the said brook, to the height of about five feet, and so as to pond back the water and over-flow the land of the said Cornelia, lying immediately on the east side of the said brook. That Udall, for the purpose, among others, of securing to the said Cornelius J. Bergen the said right, on or about the 1st day of April, 1854, did, by a deed executed by himself and his wife, bearing date on that day, grant and convey to the said Cornelius J. Bergen, his heirs and assigns, for the price or consideration of $17,500, a part of his farm lying on the west side of said brook, " together with the right to the said Cornelius J. Bergen, his heirs and assigns, in perpetuity, to pond the water in the said brook by constructing and maintaining a dam across said brook at or near the great south road, which shall raise the water of said brook, not exceeding five feet above its (then) present natural surface where the dam shall be constructed." That Udall, in and by said deed, covenanted with Bergen substantially as fol-lows : " Inasmuch as the lands on the east side of the brook hereinbefore mentioned belong to the said Cornelia J. Udall, the daughter of the said Richard A. Udall, who is a minor, and the construction of a dam across the said brook will cause a part or portion of the lands of the said Cornelia J. Udall to be overflowed, and the right or privilege to cause such over-flow, hereinbefore granted by these presents being considered by the parties hereto to form $4000 of the consideration or purchase money hereinbefore in these presents expressed, now in consideration thereof the said Richard A. Udall, for himself, his heirs, executors and administrators, doth hereby covenant, promise and agree to and with the said Cornelius J. Bergen, his heirs and assigns, that the said Cornelia J. Udall shall and will, within six months from the time she shall arrive at the age of twenty-one years, if she be then living, grant and se-cure in perpetuity to the said Cornelius J. Bergen, his heirs and assigns, or owners of the lands and premises hereinbefore granted, the right and privilege to construct and maintain and

Bergen *v.* Udall.

keep constructed and maintained the said dam across the said brook, and to overflow and keep overflowed so much of the land of the said Cornelia J. Udall as may be required to make a fall of water not exceeding five feet in perpendicular height over the same." That the said $4000, the estimated price or value of the said privilege, was secured to be paid by the said Cornelius J. Bergen, by his bond and mortgage upon the land and privilege so conveyed to him, to become payable when the plaintiff Cornelia J. Bergen should, after her arrival at the age of twenty-one years, execute and deliver a deed or instrument confirming the right granted as aforesaid. That said Bergen did, soon after the execution and delivery of the deed from Udall to him, construct such dam, to the height of about five feet, which caused the water in said brook to pond back and overflow the land of the plaintiff Cornelia J. Bergen, on the east side of said brook, to the extent of several acres, to the great detriment and injury of the said land, and her right and interest therein. That at the time of the execution and delivery of the said deed to Bergen, and of the bond and mortgage by the latter to Udall, the plaintiff Cornelia J. was an infant under the age of twenty-one years, to wit, of the age of nearly eighteen years, sole and unmarried. That she then lived with her father and his second wife, at Islip; and that on the same day, or soon after she arrived at lawful age, Udall's wife came to the room of the plaintiff Cornelia J. Bergen, and informed her that Mr. Mowbray, a justice of the peace, was coming, or had come, to the house to take her the said Cornelia's acknowledgment to an instrument confirming to the said Cornelius J. Bergen the said right, and urged her to prepare herself to see the said justice and acknowledge the said instrument. That the said Cornelia stated to her said stepmother that she had considered the matter, and had come to the conclusion not to sign away her right, and that she would not see the justice, nor sign the instrument; whereupon Mrs. Udall with violence took hold of her and shook her, and commanded her to go before the justice and sign and acknowl-

edge the instrument; and as an inducement for her to do so, Mrs. Udall represented to her, in the presence of her father, that he was in very great want of the money to be paid on the mortgage so soon as said instrument should be signed and acknowledged by her, and that if she did not sign it, or he did not get the money, he would have to go to prison; but that the said Cornelia still persisted in her refusal to see the justice or sign the instrument, and did not sign it. That on the same day, or the next following, the said Cornelia left her father's house, and went to the house on her own land, occupied by her maternal great uncle, Joshua Willis, where she continued to reside until her marriage with the plaintiff, Victor B. Bergen, and where she now resides. That while the said Cornelia was residing at the house of said Willis, and within a day or two after she had left her father's house, the said Cornelius J. Bergen tendered to her an instrument in writing to sign, confirming to him the said right or privilege so granted to him as aforesaid; that a justice of the peace was there, also, to take her acknowledgment thereof, but that she, in the presence of her said uncle and of her guardian, Samuel J. Underhill, and of said Cornelius J. Bergen, again refused to sign or acknowledge the same. That on the next day or two thereafter she was accidentally, while riding, thrown from a carriage, which caused her great bodily pain, nervousness and illness, so as to confine her to her bed for two or three days. And that, while suffering with that illness, Mary Ann Carll, the mother of Mrs. Udall, and in whose presence the said Cornelia always felt great restraint, came with Mr. Udall to the house of the said Joshua Willis, and into the room where the said Cornelia then was confined to her bed, and by urgent and pressing importunities of her father's necessities for money, and of her duties which as a daughter she owed to her father, and various other similar appeals, made in the presence and hearing of her father, and to get rid of their presence and importunities, and so that she might have peace and quiet, which in her then condition she so much re-

quired, she, the said Cornelia, did sign an instrument in writing, a copy of which was annexed, marked schedule A. That no consideration whatever was paid to her for signing the said instrument in writing, and that the same was so obtained from her by her said father, as aforesaid, and without any consideration whatever. That the price or consideration money for said right or privilege, which was secured to be paid by said bond and mortgage, of right and in justice, belong to the said Cornelia J. Bergen. That Richard A. Udall, at the time of the execution of the deed and grant to Cornelius J. Bergen, well knew, and Mrs. Udall and Mrs. Carll, at the time of their so importuning and urging her to sign the said instrument, well knew, that the price or consideration money for the right or privilege so granted to Bergen, rightfully belonged to her the said Cornelia, and that she was desirous that the money should be secured for the benefit of her sister Phebe, and her brother Richard, who were not as well provided for as herself. That on one or two occasions after the said Cornelia had arrived at lawful age, and before the said instrument was signed by her, Mrs. Carll represented to her, as one inducement to sign the same, that her father had made his last will and testament, in which he had made provision for all his children to share equally alike; that she had seen the will, and that Phebe Udall and Richard Udall, the brother and sister of the said Cornelia, would get thereby more than the amount secured by said mortgage. That her father and his wife had before then also made similar representations, which she then believed, but that said representations were wholly untrue. That the said instrument in writing, so signed by the plaintiff, Cornelia J. Bergen, was signed and delivered by her to her father by undue and improper influences, means, promptings, importunities, fraudulent representations and commands, used and practiced upon her so as aforesaid, and against her free will and consent, and while she was under restraint. That the said instrument had been proved, sufficiently to entitle it to be recorded, and it had been recorded, in the clerk's office of

Suffolk county.   And the plaintiffs claimed and insisted that the same ought to be declared null and void by this court, and ordered to be delivered up and canceled of record; and that the said Cornelia should be decreed to be entitled to the price or consideration money for the said right, so granted to Bergen, and which was secured to be paid by the said bond and mortgage, to Udall, upon her executing, freely and voluntarily, an instrument confirming such rights.   That Udall is pressing Cornelius J. Bergen for the payment of the moneys secured by the said bond and mortgage, and threatens to take proceedings to foreclose the same, and to use and set up the instrument in writing so signed by the said Cornelia, as good and valid in the law, and as a full performance of the covenant on his part in the said deed contained, and as entitling him to the money secured by the said bond and mortgage.   Whereas the plaintiffs charged and alleged to the contrary, and insisted that the said instrument in writing was null and void, and ought to be so declared, for the reasons aforesaid.   And the plaintiffs insisted that the defendant Richard A. Udall ought to be restrained by the order of this court from using, setting up, or attempting to use or set up, the said instrument as valid, in any action or proceedings at law or in equity, and also from claiming or asserting any right or benefit under the same, and to pay the costs of this action; and that Cornelius J. Bergen ought also to be restrained from claiming or deriving any benefit under said instrument, as against the said Cornelia J. Bergen, or her rights in her lands so overflowed as aforesaid.

And the plaintiffs prayed for a judgment that the instrument in writing so signed by the said Cornelia J. Bergen ought to be, and is, null and void as having been obtained from her by fraud, imposition, fear, and undue influence, and that the same be adjudged to be delivered up and canceled of record; and that Udall might be restrained from using, setting up, or attempting to use or set up, the said instrument as valid, in any action or proceedings at law or in equity, and

Bergen *v.* Udall.

from claiming or asserting any right or benefit under the same; and that Cornelius J. Bergen might also be restrained from claiming or deriving any benefit under said instrument, as against the said Cornelia J. Bergen, or her rights in her said land, until the further order of the court; and for further and other relief.

The instrument in writing referred to in the complaint, and set forth at length in schedule A. annexed thereto, executed by the plaintiff Cornelia J. Bergen after she became of age, was dated April 20, 1857. It recited the execution of the agreement by her, on the 1st of April, 1854, while an infant, by which she had granted to Cornelius J. Bergen the right to erect a dam and overflow certain lands of hers; and that Bergen had in his possession the said agreement, and refused to surrender the same for ratification, confirmation and acknowledgment by her; and that she was now of lawful age, and desirous to have the execution of the said agreement completed by her acknowledgment. She then fully and completely ratified, confirmed and secured unto the said Cornelius J. Bergen all and singular the rights, privileges and immunities contained and expressed in said agreement; and also acknowledged the execution of the same, and declared such execution to be valid and binding upon her.

The defendant Cornelius J. Bergen did not put in any answer.

The defendant Udall answered separately, denying most of the allegations in the complaint. Especially he denied that he offered to sell to Cornelius J. Bergen the land in the complaint referred to, and that Bergen refused to purchase the same unless upon the condition stated in the complaint; but he alleged that he did offer for sale a part of his farm lying on the west side of the brook, for the price or sum of $17,500, and that Bergen offered to purchase the same at that price; and before the purchase was concluded, Bergen expressed a desire to secure to himself the privilege to raise a dam and flow back the water over the land of said Cornelia J. Bergen.

That Bergen offered to erect and maintain said dam, and the terms and conditions on which the offer was made were such as appeared to the defendant would be highly advantageous to the said Cornelia J., and would tend greatly to increase the value of her property; and in consideration thereof, and for the purpose of inducing Bergen to erect and maintain said dam, and for no other purpose whatever, the defendant agreed, as a part of the terms of sale, to leave $4000 of the purchase money unpaid, and to be secured by the purchaser's mortgage upon the premises sold; the payment of which should be contingent upon the said Cornelia ratifying and confirming to Bergen the right to overflow her land, after she became of age. That the defendant and his wife thereupon executed a deed to Bergen, of the premises sold. But he denied that by said deed any reference was made, directly or indirectly, to the right to construct and maintain a dam across said brook, or to pond the water thereof; and he alleged that he refused to sign a deed prepared by Bergen, containing the covenants stated in the complaint. He denied that the said sum of $4000 was the estimated price or value of said privilege, or that the same was secured to be paid by Bergen by his bond and mortgage upon the land and the privilege so conveyed. He alleged that previous to his going to the house of Joshua Willis, where the plaintiff Cornelia J. Bergen was staying, he had repeatedly endeavored to procure from Cornelius J. Bergen the said original grant so executed and delivered to him by said Cornelia, to the end that he, the defendant, might present the same to the said Cornelia to be acknowledged by her; but that Bergen had always refused to deliver the same to him, or to give him a copy thereof for that purpose. That in consequence thereof, he, the defendant, prepared the instrument, a copy of which was annexed to the complaint, and took the same with him when he went to Willis' house. The defendant admitted that no money consideration was paid by him to said Cornelia, at the time she signed the said last mentioned instrument; but he denied that the signing of the in-

Bergen *v.* Udall.

strument was obtained from her without any consideration whatever. On the contrary, he alleged that the great value of the pond, and the benefit derived therefrom by the increased value of her farm, was the consideration therefor, and that such consideration was ample. The defendant also denied, generally, that the instrument in writing so signed by the said Cornelia J. Bergen was signed and delivered by her by any undue and improper influence, means, promptings, importunities, or fraudulent representations and commands, used or practiced upon her by any person or persons whatsoever, or against her free will and consent; or that said instrument was obtained from her while under restraint, or against her free consent. And he denied that the instrument ought to be declared to be null and void, or to be decreed to be delivered up and canceled, for any reasons whatever; or that the said Cornelia J. Bergen was entitled to the money secured to be paid by said bond and mortgage, or any part thereof. He also denied that he was using or intending to use and set up said instrument as a full performance of any covenant on his part, or that he ought to be restrained as prayed for. And he alleged that the plaintiffs were colluding to prevent the collection by the defendant of the said bond and mortgage, and that this action was brought by and through such collusion.

The cause was referred to a referee, upon whose report of the testimony taken before him the action was brought to a hearing before the court, at a special term. The material facts established by the evidence are sufficiently detailed in the opinion of the court.

*W. J. Cogswell,* for the plaintiffs.

*J. Lawrence Smith,* for the defendants.

EMOTT, J. The right to pond and to fish, which was conveyed to the defendant Bergen by Cornelia J. Udall, was cer-

tainly of some and probably of considerable value. Although there is some discrepancy in the statements or opinions of the witnesses on this point, and some of them consider the damming of the stream and construction of a pond an advantage to the property of the plaintiffs, yet this is not inconsistent with the fact that the owner of the adjoining property would prefer to pay a considerable sum, rather than forego the privileges conferred by this instrument. The conduct of the defendants, at the time when the bargain for the purchase and sale of Udall's farm was made between them, shows that the purchaser considered the right to flow the lands of Cornelia Udall, and to fish in the waters thus ponded, material to his purchase. It was expressly stipulated for and carefully secured under penalty of the loss of $4000 of the purchase money, in case the young lady refused to confirm the agreement when she attained her majority. If it would be going too far, on the present evidence, to say that the parties fixed this amount as the precise price or value of the right, still if it had been greatly disproportionate to that value, Mr. Udall would hardly have consented, while selling his farm, thus to make the payment of $4000 of the purchase money contingent upon the assurance of this privilege by his daughter—an assurance which he knew of course that he could not legally and ought not to attempt to control. The precise value of the right to be thus obtained, however, is not very important in the decision of the main question now before me ; it is sufficient that I cannot help seeing very clearly that in the transaction in question, while this young lady neither paid nor received any price, she was not bargaining for or receiving a benefit, but was parting with something which was her property. She did in fact make a voluntary conveyance of an easement in her lands of very considerable importance to the defendant Bergen, and therefore, if not for other reasons, possessing pecuniary value to her. This conveyance is not alleged by the complaint to have been improperly procured by the grantee, but to have been obtained by the father of this young woman, under circum-

Bergen *v.* Udall.

stances which it is said compel this court to set it aside. The plaintiffs' counsel is correct in saying that it is not material that the conveyance was not made to the father, the defendant Udall. It was made for his benefit, to a person indicated by him, and by his request and procurement, and the grantee, if not in fact privy to whatever there is in the case to impeach the conveyance, has not pleaded that he is a purchaser without notice, and cannot avail himself of such a defense. There is, therefore, no question of the rights of third parties in the case; and the controversy is to be determined just as if the deed made by Miss Udall had been made to, as it was for the benefit of, her father. If he could not retain it upon the facts of the cause, neither can the actual grantee, Bergen.

This, then, is a voluntary conveyance obtained from a child by her parent within a few days after her arrival at age. She became of age on the 10th and she executed this deed on the 20th of April, 1857.

The protection of persons who are either in a condition of tutelage or dependence, or just emancipated from it, and the rigorous scrutiny of deeds and agreements obtained from such parties by those who occupy such relations of confidence or control towards them, have long formed a recognized head of equity jurisprudence. Without going back through the long series of cases in which the doctrines of courts of equity on these subjects have been illustrated and enforced, it will be sufficient to recite the language of a few recent adjudications and text books of authority in which the rules by which the court acts are clearly laid down.

Judge Story remarks, (*Eq. Juris.* § 307,) "In this class of cases there is often found some intermixture of deceit, imposition, overreaching, unconscionable advantage or other mark of direct and positive fraud. But the principle upon which courts of equity act in regard thereto, stands, independent of any such ingredients, upon a motive of public policy. These courts will therefore often interfere in such cases, where, but for such peculiar relations, they would wholly abstain from

granting relief, or grant it in a very modified and abstemious manner." Again, § 308, "courts of equity do not sit or affect to sit in judgment upon cases as *custodes morum*, enforcing the strict rules of morality. But they do sit to enforce what has not inaptly been called a technical morality. They will not arrest or set aside an act or contract merely because a man of more honor would not have entered into it. There must be some relation between the parties which compels *the one to make a full discovery to the other*, or *to abstain from all selfish projects*. But when such a relation does exist, courts of equity acting upon this superinduced ground in aid of general morals, will not suffer one party standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance." The learned commentator applies these principles to transactions between parent and child, with directness and force; and the language which I have been quoting is cited with approval by Mr. Justice Daniel, in delivering the opinion of the supreme court of the United States, in *Taylor* v. *Taylor*, (8 *How.* 199.) In that case a deed from a child to her parents just after her majority, was set aside as a transaction bearing upon its face in false recitals of the deed, and similar statements repeated in a letter signed by her and delivered to her parents with the deed, evidence of the use of fraud, and the presence of undue influence, to procure it. There was no direct evidence of such facts in the case, but the court asserted the presumption which attaches to such cases; in the language of the learned judge, " transactions subject to presumptions never attaching *a priori* to contracts between parties standing upon a perfect equality;" and then declared that the manner of the execution of the deed and the facts surrounding it strengthened instead of repelling this presumption, and required of the court to set it aside without direct evidence of fraud. In *Archer* v. *Hudson*, (7 *Beav.* 551,) Lord Langdale, M. R. lays down the rule that a security obtained through the influence of a person standing *in loco parentis*, from the object of his protection, cannot stand.

He explains his meaning in this way : " If there be a pecuniary transaction between a parent and child, just after the child attains the age of twenty-one years, and prior to what may be called a complete emancipation, without any benefit moving to the child, the presumption is that an undue influence has been exercised to procure that liability on the part of the child ; and it is the business and the duty of the party who endeavors to maintain such a transaction, to show that that presumption is adequately rebutted ; and that it may be adequately rebutted is perfectly clear. This court does not interfere to prevent even an act of bounty between parent and child, but it will take care (under the circumstances in which the parent and child are placed before the emancipation of the child) that such child is placed in such a position as will enable him to form an entirely free and unfettered judgment, independent of any sort of control. The question then is whether, under the circumstances of this case, we have any evidence of that kind." For the want of such evidence the transaction was set aside.

In *Dent* v. *Bennett*, (4 *M. & C.* 269,) Lord Chancellor Cottenham quotes with approbation the argument of Sir Samuel Romilly in *Huguenin* v. *Baseley*, where that accomplished lawyer said that the relief stands upon a general principle applying to all the variety of relations in which dominion may be exercised by one person over another.

In *Hoghton* v. *Hoghton*, (11 *Eng. L. and Eq. Rep.* 134,) Sir John Romilly, M. R. first clearly states the rule, on the authority of Lord Eldon in *Gibson* v. *Jeyes*, (6 *Ves.* 266,) that whenever a man takes a voluntary donation he must assume the burden of proving the transaction righteous, that is, of showing that the donor understood what he was doing ; and in the next place, upon the same authority in the noted case of *Huguenin* v. *Baseley*, (14 *Ves.* 273,) that where the donor and donee were so situated towards each other that undue influence might have been exercised, the question is not merely what was the intention of the donor, but how that intention

was produced.   He then proceeds: "In many cases the court, from the relations existing between the parties to the transaction, infers the probability of undue influence having been exerted, and in such cases the court watches the whole transaction with great jealousy, not merely for the purpose of ascertaining that the person likely to be so influenced fully understood the act he was performing, but also for the purpose of ascertaining that his consent to perform the act was not obtained by reason of the influence possessed by the person receiving the benefit. This court holds as an inseparable condition, that this influence must be exerted for the benefit of the person subject to it, and not for the advantage of the person procuring it."

The same learned judge, in *Casborne* v. *Barham,* (2 *Beav.* 75,) said, that in certain cases there is so great an inequality between the contracting parties, so much of habitual exercise of power on the one side, and habitual submission on the other, that without any proof of the exercise of power beyond that which may be inferred from the transaction itself, a court of equity will impute an exercise of undue influence.

This case, with others, is cited by Judge Gridley, in giving the opinion in the recent case of *Sears* v. *Shafer* in the court of appeals, which contains a similar doctrine asserted and applied.   There was, in that case, no direct proof of the manner in which the instrument in question was procured.   But there was an intimate and confidential relation between the grantor and grantee, and a temper and disposition to yield by the latter to the former.   There was evidence of intercourse between them in which the paper might have been procured.   The grantor was sick and enfeebled as well as ignorant, and there was no proof that what she was doing was explained to her. The conveyance was without consideration, and was of a character inconsistent with her natural feelings and affections, as well as her interests.   The learned judge who delivered the judgment of the court of appeals says that there are cases in which undue influence will be inferred from the nature of the transaction, together with the exercise of occasional or habitual

influence. The court did not hesitate to restore Judge Barculo's decree, by which the deed in question had been annulled, as falling within these rules; although that decision had been reversed at the general term.

From the authorities thus collected and the numerous older cases to which they refer, I deduce these principles. A transaction like the present, in which a daughter immediately upon her arrival at lawful age makes a voluntary conveyance for the benefit of her father, will be examined by the court with the most jealous scrutiny and suspicion. The person relying upon it must show affirmatively not only that the person who made it understood its nature and effect, and executed it voluntarily, but that such will and intention was not in any degree the result of misrepresentation or mistake, and was not induced by the exertion, for selfish purposes, and for his own exclusive benefit, of the influence or control which he possessed as a father, over his daughter. There is no law against a child bestowing upon a parent any property of which she may be the owner because she loves him and desires to promote his interests. But there is an inflexible principle, both of public policy and private justice, which forbids a parent making use of his influence or his child's affection, to impose upon her mind a purpose of bounty to him. If the design to make the gift originated in the mind of the child, or was at least unsuggested by any agency of the parent, the act is as unimpeachable in law as it may be laudable in morals. But if the mind of the donor was brought to a purpose preconceived by the parent for his own sole advantage by an influence which she could not escape, in the circumstances in which she was placed, and which is deliberately used to effect such a purpose, then that influence or its exercise was undue and improper. And in all dealings between parent and child, under such circumstances, the most scrupulous good faith—*uberrima fides*—must be observed, and the weaker party must be put upon an equal footing with the stronger by a complete disclosure of all material facts, and the abnegation as far as possible of any con-

trol or dominion, as well as of all mere selfish projects or attempts.

Miss Udall was about 18 years of age when Mr. Bergen purchased her father's farm. She then signed a conveyance to him of the right to pond the stream which runs between her lands and his. This was done with the advice of Judge Strong, in whom she evidently and justly reposed great confidence. He testifies that he explained the matter to her as to the effect of the pond upon her property, giving it as his opinion that the property would be more valuable with it than without it, and telling her she would be able to see, before she came to an age to ratify her deed, whether this opinion was correct. Judge Strong says that she expressed herself willing to do whatever he should advise, and that he supposed, and still thinks, she understood that she could ratify or recant the act when she reached the age of twenty-one.

From this time until she attained her majority we hear no more of the matter. When she reached that period it is quite evident that she had not made up her mind as to her action, or at least that she had not determined to make the gift or conveyence.

And the first and a very material observation upon the deed now in question is, that it is plainly not an act of unsolicited bounty, or the free gift of her affection for her father. She made the first deed while under age, upon the advice of Judge Strong, and as he says, aware no doubt of the *locus pœnitentiæ* which she possessed, and of the ineffectual character of her act, so far. When she became twenty-one years of age, she made no attempt, and gave no indication of a purpose, to complete the gift. We cannot avoid seeing, without adverting to the particulars of the transaction, that this deed was obtained from the young lady, not proffered by her. It was not the result of the deliberate, unaided and uncontrolled action of her own mind, but was produced by the agency of means and motives and the suggestions of others. The deed is not to be regarded and cannot therefore be maintained as

an act of pure bounty, proceeding merely from the natural affection of a child. It was the result of a purpose which she was led by others to form, and I am brought necessarily to the examination of the manner in which that intention was produced.

Miss Udall is by no means deficient in intellect, as far as I can judge from the proofs in this case, and there is no evidence of extreme or overweening fondness on her part for her father. She is not shown and cannot be supposed to have possessed at this time more than a very imperfect acquaintance with business, or with the ultimate effect upon her property of the conveyance she was desired to make. She seems to have relied in the first instance upon the advice of Judge Strong ; but when the question was presented to her for final action, there was no one about her to whom she could resort for disinterested and competent advice. She did indeed ask advice of her uncle Joshua Willetts, and her guardian Samuel J. Underhill, but neither of them felt qualified to direct her ; and the latter, who did undertake to negotiate at one time for her interest, was not at hand when her father and his wife's mother finally procured the conveyance. She was living in her father's house up to the time of her coming of age, and left there to go to her uncle's of whom I have spoken, the same evening that she became twenty-one, partly, it is probable, to accomplish her marriage, to which her father was averse, and partly, it would seem, in consequence of a somewhat rude effort which was made by her stepmother to procure her signature to this deed. On the 10th of April, the day that Cornelia J. Udall became of age, Dr. Mowbray was sent to Mr. Udall's house, and Mrs. Udall bringing him into the room, told her stepdaughter that he had come to take her acknowledgment to a conveyance of this interest. She refused to execute the paper. Mrs. Udall told her she must do it. She started to get up from her chair, and Mrs. Udall pushed her back and told her she should sign it. She did not, however, and shortly left the apartment and went to her room, in considerable agitation. She had not,

therefore, at that time, formed a purpose to bestow this benefit upon her father; and it is hardly consistent with this or with other parts of the transaction, to suppose that her final conclusion was due to mere love and affection. The manner in which she was approached by her stepmother shows, on the other hand, that her father and his friends intended to procure this deed at the earliest opportunity, without waiting until she should be actually as well as legally emancipated, and by any means most likely to succeed.

After this a week elapsed, during which the plaintiff was at her uncle Joshua Willetts. She had been approached by Mr. Bergen with the deed, though whether he did so with any real intention or desire that she should execute it, is perhaps doubtful. Still the plaintiff had again the opportunity to make the conveyance, but again declined to do so. About a week from the day she left her father's house she was thrown from a wagon, somewhat hurt and a good deal frightened. She seems to have been unwell and hysterical for several days afterwards. The next day but one after the accident befell her, her father came to see her, bringing with him Mrs. Carll, the mother of her father's second wife, who was selected by Mr. Udall on account of her supposed influence over this young lady. Her uncle, who was an old man apparently of no great force of character, and a woman named Powell, were present during a part, and a younger sister of the plaintiff during the whole, of the interview that followed. The plaintiff was lying in or on the bed when they entered, and Mrs. Carll very soon began to speak of the difficulties upon this subject between her and her father, and the plaintiff turned away at first with a gesture of impatience. Mrs. Carll, however, persevered in urging the matter upon her, and told her it was her duty to her father to make this deed, appealing also, as one witness says, although Mrs. Carll does not remember it, to her father's necessities. During the previous week the plaintiff, as I have stated, was presented with the deed for signature or acknowledgment, by Cornelius J. Bergen. At

Bergen *v.* Udall.

this interview Mr. Samuel Underhill was present. She appealed to him for advice, but he only told her if her mind was not made up, to delay a few days, declining to advise her on the principal question. He told her, however, that as her father had a considerable sum contingent upon her making this deed, she ought to state to him her objection to it. She then authorized Mr. Underhill to tell her father that if he would secure four thousand dollars, or such other sum as might be agreed upon, to be paid to her brother and sister at his death, she would confirm the deed. This message was given to the defendant, and he replied that he had given them so much more, in his will. This subject was alluded to in the conversation between Mrs. Carll, Mr. Udall and his daughter, on the 20th, and Cornelia said she would sign the paper if her father would give the four thousand dollars to her brother and sister; she did not want it herself. She was then told by her father or Mrs. Carll, or both, that he had made a will and given them more than that amount. I cannot doubt that this was one main inducement to her to execute the paper, and that she supposed that the money which this transaction was to put in the hands of her father would be effectually secured to her brother and sister at his death, as she had desired and insisted it should. If Miss Udall had been in a position of equality, laboring under no disadvantages in dealing with her father, she might have been left to suffer the consequences of exchanging her property for her father's promise to make a will, or even his will already made. But it was the duty of those who solicited this gift from the young lady, under the circumstances of this case, either to secure this sum of money to her brother, or to her brother and sister, as she desired and insisted; or else to explain to her, fully, the effect of the alleged will of her father upon the object she desired to accomplish. She ought to have been informed that the ultimate benefit which she wished to secure to her brother and sister would be dependent upon not only the inclination but the circumstances of her father; that as he might at any subsequent

time by another will deprive them of the benefit which he now professed to have conferred upon them, so his circumstances might become or might even then be such as to make it impossible for them to receive any such benefit at his hands. The plaintiff seems to have been disposed to insist upon securing what she not unnaturally regarded as the price of what she was parting with to her blood relatives—the children of her own mother—and to have finally executed this conveyance, supposing she had done so. As I have already said, if she had been a person of mature age, of ordinary experience and free from all control or influence, she could not have been heard to complain, if she had ignorantly or too confidingly made a mistake in this particular. But it is a serious objection to this deed from a daughter who had just attained her majority, to her father, that she was suffered to make it under the belief that a bequest in her father's will would be an adequate assurance that the purchase money would ultimately go to her brother and sister.

But a still greater objection to the transaction I find in the manner in which the consequences of her determination to make or not to make the conveyance were presented to her. Mrs. Carll impressed upon her that if she refused to sign the deed, no one would be benefited but Mr. Bergen, and that the question for her to determine was whether she would benefit her father or Mr. Bergen; whether her father or Mr. Bergen should have the money. Her own rights and interests were carefully ignored. She was not told that if she declined to confirm her first conveyance, she instead of her father would hold a claim upon Mr. Bergen, and could exact compensation for the privilege of ponding, and control or dispose of the right of fishing. If no one were interested in her decision but her father and Bergen, if the result of her refusal to do what she was urged to do would be that Bergen would keep what he had and her father would lose four thousand dollars, the young lady might well assent to what was asked of her. But if she had understood, as we see now, and these parties knew then, that she

Bergen *v.* Udall.

held the key to the matter for her own benefit, and that she could exact any fair price, and she might well suppose this four thousand dollars to be the measure of such a price, as a compensation for a privilege which Mr. Bergen deemed essential, there would have been quite a different question presented for her decision. It is not credible that these parties supposed that this privilege possessed no marketable money value; and it was their duty to apprise her distinctly that there was such a value, and that until she conveyed away her rights, that value belonged to her, and not to mislead her to suppose that the only effect of her action, one way or the other, would be to benefit either her father or Mr. Bergen. After what I have now mentioned had occurred, the conveyance or deed of confirmation to Bergen was read over to her by her father and she signed it. It was witnessed by her sister and Mrs. Carll, and her father took it away with him.

This case differs from most of the cases of a similar character which are presented to the courts, because the entire history of the transaction is disclosed in evidence, and we learn all that was said and done by the parties, so that the means used and the motives urged to obtain the plaintiff's consent are matter of proof and not of conjecture. It is quite true that we cannot, upon this evidence, impute to the defendant either gross intentional misrepresentation and fraud, or threats and violent coercion. It is also plain that the plaintiff understood that she was signing a deed confirmatory of her former act, and which would confer upon Bergen the right to maintain the pond which he had constructed, and would put four thousand dollars in her father's pocket. But this is not all which the defendant must establish to sustain such a conveyance. His daughter was young and inexperienced, not yet emancipated from the natural influence and control of her father, and surrounded mainly if not entirely by those who were either under the like control and influence, or who were actively assisting his purpose and laboring for his interests. She was also at the moment suffering under the effects of an

accident, from which her nerves certainly had not yet fully recovered, if she was not more seriously indisposed. She was therefore in every respect acting at a disadvantage in treating with him in such matters, and the policy of the law and the rules of the courts, no less than a high toned morality, required of him not to take, much less to seek, any thing from her weakness. He pursued her from the moment that she came of age in order to obtain this deed, with a single regard to his interests and not hers, when he was bound, in the language of Judge Story, to abstain from all selfish projects. He did not allow her time to reflect, to consult with any competent and disinterested adviser, or to see how her interests would be affected by what he desired, or how she could secure the conditions which she had stated to him. He allowed, if he did not induce her to suppose, that after the four thousand dollars had passed into his hands, it could nevertheless be secured to her relatives by his will or his promise to make a will. He led her to suppose that she had nothing to gain by any course she could take, and that all she had to decide was whether the money should be paid to him, or he should be cheated out of it by the purchaser. And he enforced these representations by his presence and influence with her in her enfeebled state, without any one at hand to encourage any resistance to the control which he must have had over a daughter, and by urgent appeals to her duty, enforced, as one of the witnesses says, by reference to his necessities. I think a court of equity cannot refuse to interfere in such a transaction, without departing from the rules which are clearly marked out in the decisions. As is remarked by Judge Story, it is in some sense a technical code of morals which we apply to such cases, and it condemns transactions between parties in these peculiar relations, which between man and man standing as equals in fact, or even in the eye of the law, no one could impeach. Still these are wise and necessary rules, and public policy demands that they should be firmly applied, notwithstanding possible hardship in particular cases. It is indeed safer and better, in my judg-

ment, to run the risk of error in holding such transactions to too rigid rules, even in cases where the evidence is as closely balanced as it may seem to be here.

The defendant relies upon the testimony of Dr. Mowbray as to what took place the next day after this deed was signed, and upon the two letters of the plaintiff written on that day, to sustain his view of the case, or to show a deliberate confirmation of her acts by the plaintiff. Dr. Mowbray went on Tuesday to take the plaintiff's acknowledgment of the original agreement, which he says was produced by the Bergens. She acknowledged the execution of that paper, and expressed her willingness to make the conveyance. She inquired if the paper which she had signed the day before contained any thing more than the original agreement, stating that she had read it, but was not sure if she recollected it. One of the papers had been left with the Bergens, and the other with Mr. Udall. Alexander Bergen, the defendant's brother, offered to deliver the one held by him if Udall would surrender the one procured by him. On the same day she wrote to her father, stating that she had acknowledged the old deed, and insisting earnestly that the one which he had should be returned according to his promise, as she alleges. To this letter he seems to have written an answer, and then she wrote him again, saying that the original deed was acknowledged and ready to be delivered, if he would give up the other. She manifests great anxiety, for her own safety as she says, that the latter instrument should be destroyed. She then goes on to tell him of her instantly approaching marriage, to which he was opposed. She deprecates his anger and his interference, and pleads very earnestly for his acquiescence, and she asks him to send her a dress which she had prepared for the occasion, but which she had left at his house.

Now if the question were whether the plaintiff knew and intended what she was doing when she signed the deed, this testimony and these letters would be conclusive. But in the language of Lord Eldon, in *Huguenin* v. *Baseley,* cited by the

master of the rolls in a case already referred to, (*Hoghton* v. *Hoghton*, 11 *Eng. L. and E.* 138,) the question is not whether the donor knew what she was doing, but how the intention was produced; and upon this point these letters and the plaintiff's interview with Mowbray throw little if any light. They do not remove the difficulties attending that part of the case, or explain the manner in which she was brought to consent to the deed, so as to clear it of the unfair and unequal dealing which the circumstances impute to the defendant. Indeed the letters disclose an agitated and disturbed state of mind, and raise a doubt whether her approaching marriage, and the apprehension of her father's displeasure and possible interference, did not enter into the motives which led her to comply with his wishes, and at the same time contribute more or less to unfit her to form a deliberate judgment or arrive at an independent purpose in dealing with her parent.

I have come to the conclusion that the plaintiff is entitled to relief against this deed. In ordinary cases that relief would consist in absolutely annulling the instrument. But there are some peculiarities about this case. The plaintiff seems to have been willing to make this deed for a consideration, if that consideration could be secured to her brother and sister. In her complaint, she claims the price for which this privilege was sold by her father, or the $4000 mortgage which was made contingent upon her confirming it; and she asks either to have her deed declared void as to her, or for such other relief as may be just. It is also to be observed that this is not a conveyance of a parcel of land which will revert at once to the grantor, and be in her possession and at her disposal, if her deed is set aside. It is a grant of an easement—of a right to erect a dam and flow back the waters of a stream upon the plaintiff's lands, and to fish in those waters. The privilege thus obtained has been executed, and a pond made which overflows in part the plaintiff's lands, but in part also the lands of Bergen. If the plaintiff's deed were absolutely set aside, this pond and its privileges could not fall into the possession

Bergen *v.* Udall.

and enjoyment of the plaintiff, nor would she regain at once her original rights, or restore her property to its original condition. She would be driven to an action at law for her damages, or to obtain the prostration of the dam, and this latter course would probably not be so beneficial to her as its continuance with compensation to her for its erection. But all the parties to these controversies are before the court in the present action, and I see no difficulty in disposing of all the questions between them. It will therefore be referred to George G. Reynolds, Esquire, to ascertain, first, whether any sum was stipulated and agreed upon by the defendants as the price of the privileges to be conveyed to Cornelius J. Bergen by the plaintiff Cornelia J. Bergen; and if not, then what at the date of her majority was the fair value of the rights and privileges conferred by her deed. Upon the coming in and confirmation of his report, a judgment must be entered, setting aside the conveyance made by the plaintiff, unless within two months after notice of such judgment, the defendant Udall shall pay to her the amount so reported due her, with interest from the 10th of April, 1857. If such payment be made, the deed is to be confirmed and made valid, and the bond and mortgage of the defendant Bergen may be enforced by Mr. Udall for his own benefit. The question of costs is reserved until the final judgment. If the alternative offered to Mr. Udall shall be accepted by him, I suggest and recommend to the plaintiff to acquiesce in that disposition of the matter, without insisting upon costs.

[SUFFOLK SPECIAL TERM, June 1, 1858. *Emott,* Justice.]