PETER WELLER AND CATHARINE WELLER, HIS WIFE, RESPONDENTS, *v.* LOUIS WELLER AND OTHERS, APPELLANTS.

*Conveyance of property by an aged and infirm parent to his child — when it will be set aside although no fraud is proved — what facts must be affirmatively proved by the child in order to sustain the deed.*

In May, 1884, Jacob Weller, a son of the plaintiffs, died intestate, leaving his father his only heir-at-law. At the time of his death he owned real estate of the value of $165,000, and personal estate of the value of $105,000. The plaintiffs were, at that time, upwards of eighty years of age, the father especially being infirm. Neither of them could read or write or understand the English language. The husband's occupation had been that of a mechanic or day laborer until age and his infirmity incapacitated him for hard labor, and he had but little or no property except that left by his son Jacob. Shortly after the death of Jacob the plaintiffs, having confidence in the judgment of another son, Louis, and relying upon him and believing that he would be faithful to them, requested him to take charge of the property as the agent and on behalf of the father, and executed a deed and a bill of sale by which they conveyed to the said Louis, and to his brother Adam, all the said real and personal property absolutely and in fee.

Upon the trial of this action, brought to set aside the deed and for an accounting, the judge found that at the time the plaintiffs executed the deed they did not know its contents, import or effect, and that if they had known its import er effect they would not have executed it; but he did not find, in terms, either false representations or fraudulent concealment, or a fraudulent intent on the part of the defendants, or either of them, or that the defendant Louis promised to take care of the property for the plaintiffs, or that the deed was without consideration.

*Held,* that a judgment setting aside the deed should be affirmed.

That although no fraud appeared affirmatively, yet the presumption was against the propriety of the transaction, and the burden rested upon the party claiming under it to show that it was fair, well understood by the donor and freely entered into by him, and this must appear by evidence in addition to that derived from the execution of the instrument conferring the gift.

*Bergen* v. *Udall* (31 Barb., 9); *Sears* v. *Shafer* (1 id., 408) followed.

APPEAL from a judgment entered on the decision of the court in a case tried at the Erie Equity Term.

*Spencer Clinton,* for the appellants.

*Fred. Greiner* and *Truman C. White,* for the respondents.

SMITH, P. J.:

The judgment appealed from sets aside and annuls a deed of real estate executed by the plaintiffs to the defendants, Louis and Adam Weller, in May, 1884, and orders an accounting for the rents and profits. The plaintiffs are husband and wife, and the defendants, Louis and Adam, are their sons. The other defendants are the wives of Louis and Adam. Jacob J. Weller, another son of the plaintiff, died intestate, at Buffalo, May 10, 1884, leaving his father, the said Peter Weller, his only heir-at-law. At the time of his death Jacob owned real estate in Buffalo of the value of about $165,000, and personal property worth about $105,000. He owed debts amounting to not more than $185,000. Shortly after the death of Jacob, the plaintiffs executed and acknowledged the deed above referred to, purporting to quit claim and convey to the defendants, Louis and Adam, all of said real estate, absolutely and in fee About the same time, they executed to their said sons a bill of sale of all the personal property left by Jacob. Each of the plaintiffs was upwards of eighty years of age at the time of the execution of said deed. The husband, especially, was infirm, and neither of them could read, write or understand the English language. The husband's occupation had been that of a mechanic or day laborer, until age and infirmity incapacitated him for hard labor, and the plaintiffs had little or no property except that left by Jacob. Adam and Louis were active business men in the prime of life.

The complaint alleges, in substance, that upon the death of Jacob, the defendant Louis, at the request of the plaintiffs, promised

to look after the property left by his brother Jacob, and to take all necessary steps and proceedings to preserve the same and to turn over to the plaintiffs the proceeds of such, if any, as he should sell or dispose of, and that the plaintiffs, relying upon Louis and believing he would be faithful to them in looking after their interest in the property left by their deceased son, entrusted to him the duty of so doing, and executed said deed and other instruments in writing presented to them by Louis and Adam, not knowing or understanding their contents, but relying upon their statements and representations that such papers were necessary for the purpose of taking care of said property. And the complaint alleges that Louis and Adam did not disclose to the plaintiffs, but concealed from them, the nature of said deed of conveyance, with intent to cheat and defraud the plaintiffs out of said real estate. The complaint also alleges that said deed was without consideration.

The trial judge has not found, in terms, either false representations or fraudulent concealment, or a fraudulent intent on the part of the defendants or either of them, or that the deed was without consideration, or that the defendant Louis promised to take care of the property for the plaintiffs. He has found that after the death of Jacob the plaintiffs requested Louis to take charge of the property as the agent, and on behalf of his father; that the plaintiffs relied upon Louis, and had confidence in his judgment, and believed he would be faithful to them in looking after the interests of Peter in said property; that they executed the deed, without knowing its terms, import or effect, and that if they had known its import or effect they would not have executed it.

To those several findings the appellants excepted, and they now challenge their correctness, contending that they are without evidence or against the weight of evidence. The appellants requested the court to find, among other things, that the deed was read to Peter and explained to him before its execution; that it was executed by the plaintiffs, because Louis made it a condition of his taking charge of the property, in conjunction with his brother, that the property should be transferred to him; that the deed was executed under an agreement with Louis and Adam to the effect that it should be executed, and that Louis and Adam should pay the plaintiffs during their joint lives the sum of $300 yearly for

their support, and in case of the death of Peter, leaving his wife surviving him, should pay to her the sum of $200 yearly, during her life, for her support, and that Louis and Adam should divide the property among all the brothers and sisters of said Jacob, equally; and that the terms of the agreement under which the deed was executed were discussed soon after the death of Jacob, in the presence of the plaintiffs and of the other brothers and sisters of Jacob, except one. The several requests were declined, and the appellants excepted.

In respect to the questions raised by the exceptions above referred to, it is enough to say that, after a careful reading of the printed case, we find that there is evidence which, although controverted, is sufficient, if believed by the trial judge (as we are to presume it was), to support the several findings excepted to; and that whatever testimony there may be tending to sustain the propositions embraced in the several requests declined by the judge, it is controverted to such an extent as that the decision of the trial judge upon those matters is conclusive. In this view of the subject, the exceptions above stated point to no error, and we are to assume the facts of the case, in the particulars above mentioned, to be as found by the trial court.

We have said that the trial judge did not find, in terms, that the deed was without consideration. Neither did he find that it was executed for a good consideration or a consideration of any kind. On the contrary, having been requested by the defendants' counsel to find that it was executed upon a good and valid consideration, he declined to do so, and he also declined the defendants' request to find that the deed was executed upon an agreement by the defendants to pay a certain sum annually for the support of the grantors during their lives, which was the only consideration for said deed alleged by the defendants. The agreement, so alleged, purported to be in writing, executed by Adam and Louis, only, and bearing even date with the deed. The judge found that neither of the plaintiffs knew the contents or effect of that writing; that it was never accepted by them or either of them; nor did either of them ever consent to the making or execution thereof. There is evidence in the case which, although controverted, tends to sustain those findings. But if the agreement had been made under such

circumstances as to be binding, it is apparent from the testimony that the defendants were to be reimbursed from the property left by Jacob, the amount of their advances for the support of the plaintiffs. This appears from the cotemporaneous agreement made by the defendants with their four sisters, by which they agreed to pay over to each of them one-sixth of the surplus of the yearly· rents and profits of the real estate, after the payment of all expenses which they might incur for the support of their parents, and also one-sixth of the proceeds of a sale of any of such real estate, after providing from such proceeds a fund for the future support and maintenance of their parents. The same feature appears in the declaration of trust in behalf of the sisters, which the defendants executed after the commencement of this suit. In corroboration of this view of the matter, is the fact, found by the trial judge, that all moneys paid to the plaintiffs by Louis and Adam came from the personal estate left by Jacob. The deed is, therefore, to be regarded as being without consideration; and the question is presented whether such voluntary conveyance, executed by needy parents, in extreme old age, to their sons, in whom they confided, and in ignorance and misapprehension of its contents and effect, should be upheld by a court of equity, although not found by the trial court, as a matter of fact, to have been induced by actual, positive fraud.

Upon well established principles, a transaction of that nature, accompanied by the circumstances existing in this case, should not be allowed to stand. A voluntary gift will not necessarily be set aside, because made to a donee standing in a relation of trust and confidence to the giver, but transactions of that nature are viewed by courts of equity with suspicion, and scrutinized with the extremest vigilance. It is not enough that no fraud appears affirmatively, but the presumption is against the propriety of the transaction, and the burden rests upon the party claiming under it to show that it was fair, well understood by the donor and freely entered into by him; and this must appear by evidence in addition to that derived from the execution of the instrument conferring the gift. And, usually, evidence is required that a third and disinterested person advised the party of all his rights. These rules are so frequently and uniformly asserted in adjudged cases and by text writers that it is

hardly necessary to make citations in support of them. It may be well, however, to refer to a few authorities for the purpose of showing their decisive control in the present case.

Story, in his work on Equity Jurisprudence, after remarking that in cases of constructive frauds arising from some peculiar confidential or fiduciary relation between the parties, there is often to be found some intermixture of deceit, imposition, overreaching, unconscionable advantage, or other mark of direct and positive fraud, goes on to say, that " the principle on which courts of equity act in regard thereto, stands, independent of any such ingredient, upon a motive of general public policy; and it is designed, in some degree, as a protection to the parties against the effects of over-weening confidence and self delusion, and the infirmities of hasty and precipitate judgment." (Vol. 1, § 307.) Again: Courts of equity " do not sit, or affect to sit, in judgment upon cases as *custodes morum*, enforcing the strict rules of morality. But they do sit to enforce what has not inaptly been called a technical morality. * * * Courts of equity will not, therefore, arrest or set aside an act or contract merely because a man of more honor would not have entered into it. There must be some relation between the parties which compels the one to make a full discovery to the other, or to abstain from all selfish projects. But when such a relation does exist, courts of equity acting upon this superinduced ground in aid of general morals, will not suffer one party standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance." (Sec. 308.) And, in speaking of transactions between attorney and client, the same learned writer says : " On the one hand, it is not necessary to establish that there has been fraud or imposition upon the client ; and, on the other hand, it is not necessarily void throughout, *ipso facto*. But the burthen of establishing its perfect fairness, adequacy, and equity, is thrown upon the attorney, upon the general rule that he who bargains in a matter of advantage with a person placing a confidence in him is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other. If no such proof is established, courts of equity treat the case as one of constructive fraud." (Sec 311.)

In *Bergen* v. *Udall* (31 Barb., 9), a grant without consideration, from a daughter who had just attained her majority, to her father, of a valuable easement upon her land, was held to be void and was set aside upon the application of the rules above stated. Although it was held that the evidence fell short of showing either gross intentional misrepresentation and fraud, or threats and coercion on the part of the father; yet as the grant was not the result of the deliberate, unaided and uncontrolled action of the daughter's own mind, but was procured by the agency of means and motives and the suggestions of others, it was set aside. It will be observed that the means and suggestions made use of by the others thus adverted to were not held to constitute, *per se*, what the law regards as "undue influence;" the impropriety of their use resulted wholly from the relation of confidence existing between the parties. "There is an inflexible principle," said EMOTT, J., who tried the case, "both of public policy and private justice, which forbids a parent making use of his influence or his child's affection to impose upon her mind a purpose of bounty to him." (P. 25.) He referred to the case of *Hoghton* v. *Hoghton* (11 Eng. L. and Eq. R., 134), in which Sir JOHN ROMILLY, M. R., first clearly states the rule, on the authority of Lord ELDON in *Gibson* v. *Jeyes* (6 Ves., 266), that whenever a man takes a voluntary donation he must assume the burden of proving the transaction righteous, that is, of showing that the donor understood what he was doing; and in the next place, upon the same authority in the noted case of *Huguenin* v. *Baseley* (14 Ves., 273), that where the donor and donee were so situated towards each other that undue influence might have been exercised, the question is not merely what was the intention of the donor, but how that intention was produced. He then proceeds: "In many cases the court, from the relations existing between the parties to the transaction, infers the probability of undue influence having been exerted, and in such cases the court watches the whole transaction with great jealousy, not merely for the purpose of ascertaining that the person likely to be so influenced fully understood the act he was performing, but also for the purpose of ascertaining that his consent to perform the act was not obtained by reason of the influence possessed by the person receiving the benefit. This court holds, as an inseparable condition, that this influence must be

exerted for the benefit of the person subject to it, and not for the advantage of the person procuring it." (Pp. 23, 24.)

*Sears* v. *Shafer* (1 Barb., 408), was the case of a release executed by a widow to her three brothers of her interest in certain real estate of which heir father had died seized in 1807, leaving a will by which he devised the same to his sons generally, without words of limitation or inheritance, the release reciting that the parties believed that the testator intended to devise in fee, but that the terms of the will gave only a life estate, and the release was designed to give effect to such intention. The widow having died, her children filed their bill to obtain a decree setting aside the release on the ground that it was obtained by fraud and undue influence. There was no evidence of actual fraud, and none that the particular paper — the release — had been procured by undue influence. A witness testified that a few days after Elizabeth (the widow) had been to her brothers, the witness while standing at the door overheard Elizabeth tell her brother that she was not willing to sign any more papers; that he had compelled her to sign those papers that she had signed before against her will, and she was very sorry for it. It did not appear that the release was one of the papers referred to, and from the connection in which that item of testimony is alluded to in the opinion of the trial court, it would seem that it was not introduced by the plaintiffs as tending to show that the release was procured by undue influence, but it was brought in by defendants to show that the execution of the release was not kept secret, but was talked about by the grantor, though, as the court remarked, the testimony tended to weaken rather than strengthen the defendant's case. (P. 417.) The circumstances relied upon in granting the decree were (1) the enfeebled bodily condition of the sister, she having been afflicted with a fatal malady for years; (2) the relationship of the parties; (3) the fact that the release was prepared at the instigation of one of the brothers, and (4) the want of satisfactory proof that the sister fully understood the nature and effect of the release. Under the latter head, stress was laid upon the circumstances : (1) There was no proof that the release was read over in her hearing; and (2) she was unable to read English, or even to write her name. Judge BAROULO, who tried the case at Special Term, set aside the release, applying to the case

the principles above stated. The decree was reversed at General Term, but was affirmed by the Court of Appeals (2 Seld., 268).

In some material particulars the present case closely resembles that of *Sears* v. *Shafer.* Here, the plaintiffs were old and feeble. They were unacquainted with business. They confided in their sons to manage their affairs. The conveyance executed by them was without consideration. It was prepared by the grantees, and nothing was known about it by the grantors till it was presented to them for execution. It was not read to them. They could not read or write English, or even understand it, except to a very limited extent. In these respects the present case is almost a repetition of *Sears* v. *Shafer.* But it exceeds it in its equities, so far as the equities depend upon the amount of property involved.

The defendants in this case sought to prove a state of facts, which, if established, would have taken the case out of the operation of the rules above stated, but in that effort they failed. Several particulars have already been referred to, in which the testimony produced by them was controverted, and the fact was found against them. Only one other need be mentioned. Louis and Adam testified positively that at the time when the deed was executed by the plaintiffs, it was read over to them by Mr. Avery, the notary before whom it was acknowledged and in whose presence the plaintiffs signed it by making their mark. In that they are contradicted by several witnesses, including Mr. Avery, who, although he did not recollect distinctly all that occurred, stated that he did not believe that he read the deed to them, and he explained the grounds of his belief. All the testimony on the part of the defendants about a prior agreement between themselves and the plaintiffs being excluded (as it must be in the consideration of the appeal, since the finding of the trial court is against it upon sufficient contradictory evidence), the case is the bald one of a grant to the sons, without consideration, of the valuable real estate of these old people, prepared by the grantees, and by them presented to their parents and procured to be executed by them in ignorance and under a misapprehension of its contents. The presumption of improper influence is irresistible. No disinterested third person repels it by his testimony. Neither Mr. Avery, the notary, nor Mr. Wilson, who drew the deed, knew anything of the circumstances that pre-

ceded and led to its execution. The unilateral agreement of Louis and Adam, respecting the support of their parents — unilateral because signed by them without the knowledge, consent, acquiescence or acceptance of the other parties named — obviously avails nothing as a defense. Neither does the declaration of trust made by them, for the benefit of their sisters, after this suit was commenced.

We have examined the several exceptions taken by the defendants' counsel, but do not think they point to any substantial error. Most of them have been met by the views already expressed, and the others, obviously, are immaterial.

The judgment should be affirmed, with costs. .

BRADLEY, J., concurred; BARKER, J., not voting; HAIGHT, J., not sitting.

Judgment affirmed, with costs.