Sears *v.* Shafer.

SAME TERM. *Before the same Justice.*

SEARS and others *vs.* SHAFER and SHAFER.

Where a person interested in remainder in real estate devised to others for life, voluntarily, and as a free gift, conveys her interest to the tenants for life, from a sense of justice, and to carry into effect the supposed intentions of the testator, such conveyance is valid, if executed by the grantor freely and understandingly, with a full knowledge of her rights and interests, and of the consequences of her act.

The opinions of witnesses, as to the mental capacity of a grantor in a conveyance,

Sears *v.* Shafer.

or as to his being subject to the control of others, are inadmissible as evidence. The only legal testimony on such subjects—except in cases of witnesses to a will, or on questions of science—consists of the acts and declarations of the parties evincing a want of capacity or subjection to influence.

It is for the court, and not the witness, to form an opinion from the facts.

Where a gift is disproportionate to the means of the giver, and the giver is a person of weak mind, of an easy temper and yielding disposition, liable to be imposed upon, a court of equity will look upon such a gift with a very jealous eye, and will very strictly examine the conduct and behavior of the person in whose favor it is made. If it can discover that any acts, or stratagems, or any undue means, have been used by him to procure such gift; if it see the least speck of imposition at the bottom, or that the donor is in such a situation with respect to the donee as may naturally give the latter an undue influence over the former; if there be the least *scintilla* of fraud, the court will interpose.

The principle upon which a court of equity grants relief against conveyances obtained by fraud, or undue influence, is applicable to all cases where the relation between the parties gives one a controlling influence over the other.

The fact of a deed having been prepared at the sole instance of the grantee, and not shown to the grantor, or mentioned to him, until the same was presented for execution, is a suspicious circumstance, and raises a presumption of fraud. But it is not decisive, and may be rebutted by proof that there has been no abuse of confidence by the grantee.

It is incumbent upon a party who sets up a voluntary conveyance executed under suspicious circumstances, to show affirmatively that the transaction was fair and honest.

IN EQUITY. Dedrick Shafer, of the county of Orange, grandfather of the plaintiffs and defendants, died in 1807, leaving his last will and testament, by which he devised to each of his three sons, Dedrick, Daniel and Frederick, a farm, generally, without words of limitation, or inheritance, and gave to his daughter Elizabeth £720, to be put out by the executors, and the interest paid to her annually. The three sons were appointed executors, and, soon after their father's death, took upon themselves the execution of the will. On the 5th day of February, 1820, Elizabeth, being then the widow of Benjamin Sears, deceased, executed to each of her brothers a release of the farm so devised to him, reciting therein that the parties believed that the testator *intended* to devise in fee, but that the terms of the will gave only a life estate, and that the release was designed to give effect to such intentions. Elizabeth died on the 28th of July, 1820, leaving the plaintiffs her children and heirs

at law, surviving her, some of whom were infants of tender age. The sons are also dead. Frederick died in 1841, and left the defendants his children and heirs at law—having conveyed the premises in question to the defendants respectively, in two parcels, by deed, before his death. In the spring of 1846, the defendants respectively served notices upon the plaintiffs, requiring them to assert their claim to the lands in question, pursuant to the statute for the determination of claims to real estate. The plaintiffs thereupon filed declarations in the supreme court to said claims, and issue was joined thereon. The plaintiffs then filed their bill to obtain a decree setting aside the release so given by Elizabeth to Frederick, on the ground that the same was obtained by fraud and undue influence.

*Wm. S. Sears & C. Borland,* for the plaintiffs.

*S. J. Wilkin,* for the defendants.

BARCULO, J. It is a proposition too plain to admit of discussion, that under the devise in his father's will, Frederick took but a life estate in the premises in question. Upon the father's death, therefore, the remainder vested in his heirs at law ; of whom Elizabeth was one ; and as such, she was entitled to a fourth part of the estate not disposed of by the will. This one-fourth passed to her heirs at law, the present plaintiffs, unless her interest was conveyed by the release dated 5th of February, 1820. The whole case, consequently, turns upon the validity of that instrument.

It is not pretended that, at the time it bears date, Elizabeth was a lunatic or otherwise wholly incompetent to do any legal act. The utmost that is claimed by the plaintiffs' counsel is, that she was greatly weakened and prostrated in body, by disease and pain, and that thereby her mind had become enfeebled and exposed to the action of exterior influences; that she had always lived on terms of friendship with her brothers, and reposed in them the most implicit confidence; and that taking advantage of this position, they had exercised an undue

influence over her, and procured from her this release, without consideration, and under such circumstances as require this court to pronounce it void.

Before proceeding to examine the main question, it may be proper to notice one point of the argument which was very strenuously urged upon the court, and to which numerous authorities were cited. The counsel claimed that this release, being of a valuable interest in lands, was without consideration, and therefore void. This would undoubtedly be true, if. the transaction assumed the aspect of a purchase and sale; but the defendants do not claim to hold as purchasers for a valuable consideration, in the ordinary acceptation of that phrase. They claim that the testator intended to give the land to Frederick, in fee, and was only prevented by an arbitrary rule of law; and that Elizabeth, from a sense of justice, and to carry into effect the intentions of her father, voluntarily, and as a free gift, conveyed her interest to her brothers. If this be so—if she executed this release *freely* and *understandingly*, with a full knowledge of her rights and interests, and of the consequences of her act, it must stand. " *Stat pro ratione voluntas.*" For, the relations of the parties are such, that a mere gift, by a proper conveyance, would be valid. "Every man may give a part or all of his fortune to the most worthless object in the creation; and the court of chancery never did rescind or annul donations, merely because they were improvident, and such as a wise man would not have made, or a man of very nice honor would not have accepted." (*Shelford on Lunatics,* 268.)

Let us then, in the first place, proceed to inquire into the mental condition of the grantor at the time of signing the release, and see how far it partakes of that character which will justify the court in estimating it as one of the component parts of a case of fraud, requiring relief. Much of the testimony on this point was objected to by the defendants' counsel, and must be rejected and laid out of the case. This is the case as respects all the answers giving the *opinions* of witnesses as to the capacity of Elizabeth, or as to her being subject to the

Sears *v.* Shafer.

control of her brothers. The only *legal* testimony on such subjects, except in case of witnesses to a will, or on questions of science, consists of the *acts* and *declarations* of the parties evincing a want of capacity or subjection to influence. (*Cowen & Hill's Notes,* 759.) It is for the court, not the witness, to form an *opinion,* from the facts. In this case, the witnesses have very freely given their *opinions* on this subject; in many instances, without stating a single fact to sustain them. All such testimony must be disregarded; and the plaintiffs are not to be allowed the costs of taking it, if a decree should go in their favor. In regard to the testimony objected to merely on the ground of its being in answer to leading questions, it cannot be wholly rejected. The rule at law is, that no exception will lie for allowing leading questions to be put by a judge at circuit. Testimony of that description, however, so far as it appears to have been drawn out by the form of the question, will be entitled to much less consideration, than if the questions had been fairly put.

The legitimate evidence establishes the fact that Elizabeth Shafer was naturally of a mild and easy disposition, that she was afflicted with a terrible disease, which had been preying upon her health for a long time. A cancer in the lip was gradually eating into her throat, occasioning great pain, as well as difficulty in eating and conversing. In the fall of 1819 she went to New-York to have an operation performed; but finding it could not be done, she returned greatly depressed in spirits; and from that time was chiefly confined to her room, and a portion of the time confined to her bed, despairing of relief. In the language of a witness, " she appeared to sink down in mind and body." During all this period her pain was so acute as to require the taking of laudanum, by way of anodyne, several times a day. It is quite clear that there is nothing in all this like incapacity. There was no doubt intellect enough remaining to create a valid disposition of her estate, in the absence of other *indicia* of fraud. But the situation of this woman is proper to be taken into consideration, with the other circumstances; as being that of a person much impaired in body and

somewhat enfeebled in mind; as one not likely to be vigilant
and alert in looking after her pecuniary interests; as one who
would be apt to lean on her relatives and friends for advice and
assistance in the management of her estate; and who, to some
extent, would be weak in resisting importunities, and liable to
be affected by undue influence coming, as she supposed, from a
friendly source.    The law recognizes this partial imbecility, and
throws its protection around persons thus situated.    And, whilst
the court disclaims all jurisdiction to interfere on account of the
folly or improvidence of an act, done by a person of sound though
impaired mind, understandingly and deliberately, yet there are
numerous instances in which persons of weak understanding
have been relieved, when they appeared to have been imposed
upon in their dealings; and unreasonable purchases and secu-
rities which had been obtained from them, have been set aside
in their favor, when want of consideration, or the improvident
nature of the transaction, has raised a presumption that fraud
and misrepresentation were employed.    (*Shelf. on Lun.* 267.)
When the gift is disproportionate to the means of the giver, and
the giver is a person of weak mind, of an easy temper and
yielding disposition, liable to be imposed upon, the court will
look upon such a gift with a very jealous eye, and will very
strictly examine the conduct and behavior of the person in
whose favor it is made.    If it can discover that any arts or
stratagems, or any undue means, have been used by him to
procure such gift; if it see the least speck of imposition at the
bottom, or that the donor is in such a situation with respect to
the donee as may naturally give him an undue influence over
him; if there be the least *scintilla* of fraud, a court of equity
will interpose. (*Gartside* v. *Isherwood,* 1 *Bro. C. C.* 560.
*Clarkson* v. *Hanway,* 2 *P. Wms.* 203.    *Bennet* v. *Vade,* 2
*Atk.* 325.    *White* v. *Small,* 2 *Ch. Cas.* 103.    *Osmond* v. *Fitz-
roy,* 3 *P. Wms.* 130.    *Chesterfield* v. *Jansen,* 2 *Ves.* 125.
*Lewis* v. *Pead,* 1 *Ves. Jun.* 19.    *Harding* v. *Handy,* 11 *Wheat.*
125.    *Portington* v. *Eglington,* 2 *Vern.* 189.)

The next circumstance to be considered is, the relationship
of the parties.    The three brothers were the executors of their

father's will, and trustees of the legacy bequeathed to Elizabeth. The sister, after the death of her husband, naturally turned to her brothers for counsel and aid in the management of her little property. The evidence shows that they lived on the terms of the closest friendship, and that she always advised with them, or some of them, in regard to her affairs; and had full confidence in their judgment and integrity. The books are full of authorities showing the jealousy with which courts regard transactions between persons connected by fiduciary relations. It is a very common occurrence in the English courts, to set aside deeds and gifts made by a ward to his former guardian, soon after coming of age. (*Hylton* v. *Hylton.* 2 *Ves. sen.* 547. *Dawson* v. *Massey,* 1 *Ball & Beatty,* 219. *Aylward* v. *Kearney,* 2 *Id.* 463.) So also in regard to conveyances from a client to his attorney. (*Welles* v. *Middleton,* 1 *Conn.* 112. *Wood* v. *Downes,* 18 *Ves.* 120.) A conveyance to a clergyman by one who confided in him as a spiritual guide, was set aside in *Huguenin* v. *Basely,* (14 *Ves.* 273.) An agreement by a patient in favor of his physician was also set aside. (7 *Sim.* 539; *S. C. on appeal,* 4 *Mylne & Craig,* 269.)

But the principle is by no means confined to these classes of cases. It is applicable to *all* cases where the relation between the parties gives one a controlling influence over the other. In the language of Sir Samuel Romilly, in *Huguenin* v. *Basely,* "the relief stands upon a general principle, applying to all the variety of relations in which dominion may be exercised by one person over another." As in the case of a wife who insinuated herself into the favor of an old man, and clandestinely obtained from him a conveyance of his estate. (*Hervey* v. *Hervey,* 1 *Atk.* 564.) And in the case of an agreement made by an uncle, on his death bed, in favor of his nephew. (*Willan* v. *Willan,* 16 *Ves.* 72.) So when a servant had accompanied a young nobleman on his travels during his minority, to protect him from imposition, and remained with him till he was twenty-seven years of age, and then persuaded him to give him a bond for £1000, the court relieved on the ground of fraud, and decreed the bond to be delivered up, saying that the servant, instead of

acting agreeably to his trust, had been guilty of imposition; and that a breach of trust was of itself evidence of the greatest fraud; because a man, however careful otherwise, was apt to be off his guard when dealing with one in whom he reposed confidence. (3 *P. Wms.* 129.) Upon the same principle, the chancellor of the state of Maryland annulled a deed obtained by a daughter from her mother, in pursuance of a promise made to her father before his death, by "most gross abuse of confidence and by a fraudulent combination." (*Colegate D. Owen's case,* 1 *Bland's Ch. Rep.* 370.)

3. Another fact worthy of consideration is, that the release was prepared at the instigation of Daniel, one of the brothers. He employed an attorney to draw this and two other similar releases—one in favor of each of the brothers—and it does not appear that Mrs. Sears had any interview with the attorney, or knew any thing about the papers, until they were presented for execution. In *Owen's case,* (*sup.,*) the chancellor mentions as a prominent badge of fraud: "The deed was prepared at the sole instance of the defendant. It was never at any time submitted to the consideration of the plaintiff, or in her possession for an instant before its execution." All this is emphatically true in the present case. Shelford thus lays down the rule, page 271. "The fact of a deed having been prepared by the party who takes a benefit under it, is generally considered a suspicious circumstance, and raises a presumption of fraud; but it is not decisive, and may be rebutted by showing that the party has not abused the confidence placed in him. For where an instrument is prepared by direction of the party who seeks advantage from it, and the other party has no person with whom he consults on the subject, or any thing is withheld from a person so consulted, a great degree of jealousy attends the instrument." Daniel seems to have been the principal actor in procuring the release. This was probably owing to his being more intimate with, and having a greater share of the confidence of his sister. But the three brothers are so connected in the transaction, that each is affected by the acts of the other. They were all in the same situation; each held a farm by the

same tenure ; each required a release from the heirs at law of their father to perfect their title. They released to each other and Elizabeth signed the release with them.

4. The circumstances attending the execution of this paper have an important bearing upon this case. It is obvious that the mode in which the papers were prepared is of very little consequence, provided they were submitted to her, and fairly examined and understood by her, before execution. On the other hand, if they were not read by, nor to, her, nor explained to her, then it is indeed difficult to see how they can stand as her deeds. It appears from the evidence, that in the latter part of January, or the first of February, Daniel went to the residence of Mrs. Sears to take her to his house. She was unable to go the first and second times he went for her. The third time she went with him and remained at his house a day and one or two nights. This was about the time of the execution of the releases. But whether they were executed during this time, or a few days afterwards at her house, is left in some doubt. The preponderance of the testimony is in favor of the latter supposition. Gen. Borland, the surviving subscribing witness, does not recollect the execution of the paper ; his impression is that it was executed at Mrs. Sears' house. Eve Shafer, the mother of the defendants, swears that she was present at the house of Mrs. Sears when *a* release was signed ; that Gen. Borland brought the release there and read it over to the persons there, of whom Mrs. Sears was one. I think the fair conclusion is, that Mrs. Sears was taken down to Daniel's, and her assent obtained to the arrangement ; that Daniel then went to Gen. Borland's and had the papers prepared, and then the parties, at a subsequent day, met and executed them at the house of Mrs. Sears. But the circumstances attending this transaction do not satisfy my mind that Mrs. Sears fully understood the nature and effect of the papers she was induced to sign. There is no direct proof that this release was read over in her hearing. The most that is said by the defendant's mother is, that Gen. Borland read over *a* release while they were all present. Now Mrs. Sears was unable to read English at all,

or even write her name. It would be presuming a great deal, to infer that she understood fully the effect of such a paper, even if the proof was clear that she heard it read. She may very well have supposed that it was a paper necessary to be signed in order to carry into effect some portion of her father's will. At all events, it is incumbent upon a party who sets up a conveyance of this kind to show affirmatively that the transaction is fair and honest. The relation of the parties—the magnitude of the gift, compared with the means of the giver—the activity on the part of the donee, and the passive condition of the donor, all tend to throw a suspicion about the act, which throws the burden of proof upon the person seeking to avail himself of such an instrument. In the language of Lord Eldon in *Gibson* v. *Jeyes*, (6 *Ves.* 266,) " those who meddle with such transactions take upon themselves the whole proof that the thing is righteous."

I am aware of the difficulty of making full and explicit proof of a fact, after the lapse of twenty-seven years; and I have therefore carefully looked through the depositions to find some of the ordinary proof presented on such occasions, to supply the place of direct evidence. But I have been unable to discover any traces of an intention on the part of Mrs. Sears to make this donation. I cannot learn that the subject of her father's will was ever talked over in her presence, or that she ever knew of the manner in which the real estate was devised. The only conversation held by her in relation to the release, if any, was after its execution; and that tends to weaken rather than strengthen the defendants' case. Mary Sears, a step-daughter of Elizabeth, who was a member of her family, testifies, that a few days after the latter had been to her brother Daniel's, she (Mary) while standing at the door overheard Mrs. Sears tell Daniel that she was not willing to sign any more papers; that he had compelled her to sign those papers that she had signed before, against her will, and she was very sorry for it. It would seem also from the testimony of this witness, that nothing was known in the family relative to this transaction prior to the

death of Elizabeth; and the releases were not recorded until the year 1841.

It is said that the *intention* of the testator to devise the lands to his sons in fee, is so apparent as to raise a strong moral obligation on the part of the sister to convey. But I am by no means sure that such was the actual intention. The will is well drawn, has the regular attestation clause, and a note of interlineations. It is obviously the workmanship of a lawyer, or some one acquainted with that business. The *law* declares the intention : the testator is presumed to have intended what he has done. It is manifestly unsafe to conjecture that a man intends any thing different from that which he has legally expressed, or that he has used words in any other sense than that which the law affixes to them. If it were material to institute a comparison, it would appear much more reasonable to conclude that the testator intended to give but a life estate, as he clearly has done by the will which he signed in the presence of three witnesses, than that the daughter understood the true force and effect of the release to which she put her mark, and by which she stripped her infant children of the estate which the law devolved upon them. Upon the whole, I see no ground upon which this release can stand. A decree must therefore be entered annulling it, and declaring the rights of the plaintiffs, as heirs at law of Elizabeth Sears, as if no such instrument had been made.

The defendants must also be charged with the costs of this suit.