TOUMEY *v.* THE STATE, 8 Smedes & Marshall, 104.

RAPE

Questions are leading, which suggest to the witness the answer desired; or which embody a material fact, and may be answered by a mere negative or affirmative; or which involve an answer bearing immediately upon the merits of the cause, and indicating to the witness a representation which will best accord with the interests of the party propounding them.

On the examination in chief, it is irregular and improper to propound a question which assumes a fact to be proved which is not proved;—whether such a question is or is not a leading question.—*Quære ?*

It is a well-established general rule, that leading questions should not be propounded to a witness on the examination in chief; but there are exceptions to this general rule; as where the witness is manifestly reluctant and hostile to the interest of the party calling him; or where he has exhausted his memory without having stated the particular required, as a proper name or other fact, which cannot be arrived at by a general inquiry; or where the witness is a child of tender years, whose attention cannot be otherwise called to the subject matter.

The circuit court before which the examination is had, is allowed to exercise a certain discretion in permitting leading questions to be propounded to a witness on the examination in chief; that discretion, however, is not an absolute or arbitrary one, but is subject to revision in the appellate court; and if it appear that leading questions were propounded under circumstances that did not justify them, and that the party against whom they operated excepted to them at the time, this court will reverse the judgment, and grant the injured party a new trial.   Mr. Justice Clayton dissenting as to the power of the appellate court to revise the discretion exercised by the court below in permitting the leading questions.

This discretion of the court to permit leading questions on the examination in chief, is allowed to be exercised alone in the cases forming exceptions to the general rule, and where these do not exist, the discretion is not allowed; as where the witness is a willing witness, of competent age, or favorable to the party calling him; in these cases, to allow leading questions will be a fatal error.

On the trial of the prisoner for a rape, the victim of the outrage being a witness for the state, testified that the crime had been committed about seven months before indictment found, which, as far as appeared by the record, was the first disclosure by the witness of the commission of the crime; it also appeared that the prisoner had been the guardian of the witness from early orphanage, and was her step-father; and that she was, at the time of the alleged offense, sixteen years of age;—she was then asked; "Did the prisoner then, or at any subsequent time, say anything to you in relation to this matter to dissuade you from disclosing it? State when, where and what he said." This was held to be a leading and illegal question.   Mr. Justice Clayton, dissenting, held the question to be legal and proper.

Under the same circumstances, the following question propounded to the same

witness was held to be leading and improper viz.: "Did the prisoner, at any time subsequent to the transaction, say anything to you about what punishment the laws of Mississippi would inflict on you or him, or both? State it all." Mr. Justice Clayton dissenting.

Under the same circumstances, the question to the same witness, " If the prisoner, in any of his antecedent conversations offered property, or any other advancement to you in order to attach you to him, say so ;" was held to be illegal and inadmissible. Mr. Justice Clayton dissenting.

On the trial of a prisoner for a rape upon his ward, the entire record of his proceedings, as guardian, in the probate court, including his accounts and settlements and appropriations of the ward's property, is evidence to establish the continuing guardianship of the prisoner over the ward; and if the prisoner desire to exclude any portion of the record as irrelevant, he should move to exclude the irrelevant part, and not the whole record; in default of which the admission of the whole record will not be error, though the prisoner except to it at the time. Chief Justice Sharkey dissenting, and holding that the whole record was inadmissible, as calculated to prejudice the jury against the prisoner, inasmuch as it showed that he had squandered the property of his ward, besides having despoiled her of her virginity.

The prisoner was on trial for a rape, and a witness was asked if he had not at a certain time authorized his wife to offer the victim of the outrage a home, and in what manner he had authorized it; and the record, without setting forth the answer of the witness, stated in general terms that he answered the question in the affirmative, and stated the reasons which he had stated to his wife; it was held that, the record not disclosing what the testimony was which the witness gave, the court could not determine as to its legality. Chief Justice Sharkey dissenting, and holding that, let the testimony be what it might, it was inadmissible, being a conversation between a man and his wife, not in the presence of the prisoner, and forming no part of the *res gestæ.*

On the trial of a prisoner for a rape, if the victim of the outrage be a witness in the cause, it is competent for the prosecution to prove her good character, by way of confirming her credibility before the jury.

Error to the circuit court of Claiborne county.

At the May term, 1845, of the circuit court of Warren county, Isaac Toumey was indicted by the grand jury, for a rape upon the person of Mary Folkes, on the first day of September, 1844. The venue was changed to Clairborne county, where at the June term of the circuit court, he was tried and found guilty, and sentenced to twenty years in the penitentiary.

The bill of exceptions, made part of the record in the case, shows substantially as follows: Mary Folkes, on behalf of the prosecution, testified that about the first day of September, 1844, the defendant committed a rape upon her in Warren county, near a bridge in the main road from Vicksburg to Warrenton; the rape was committed ten or twelve steps from the road, behind an embankment about two miles from Warrenton. She was then just sixteen years old. The counsel for the state then asked the witness, " Did Mr. Toumey then, or at any subsequent

time, say anything to you in relation to this matter to dissuade you from disclosing it? state when, where and what he said." To this question the counsel for the prisoner then and there objected, but the objection was overruled, and the prisoner excepted. The record proceeds—in answer to this question the witness stated that the prisoner had charged her not to tell it, that it would ruin her, and her friends would desert her, that it would hurt her mother's feelings, (who was the prisoner's wife), and she would not be believed; the witness further testified that the prisoner had always been very affectionate towards her, and said he loved her better than any child he ever saw. She had lived with him as her guardian and stepfather from eight or nine years old to 1842." The counsel for the state then asked the following question, to wit: " If in any of his antecedent conversations he offered property or any other advancement to you, in order to attach you to him, say so." (The objection to this question being made, overruled, and exceptions taken, the record proceeds), " The witness answered, the prisoner had talked of adopting her and of leaving her half of his property; that on their way to Vicksburg on the morning of the day the rape was committed, he offered to give her a gold watch and fifteen dollars, to induce her to consent to his desires." The counsel for the state then asked witness the following questions, viz: " If at any time subsequent to this transaction, he said anything about what punishment the laws of Mississippi would inflict on him, or you, or both? State it all." (To this question a like objection was made, and exceptions taken to its admission). The witness answered that the prisoner said it would penitentiary him and her, both; this was said about the first of March, last.

The record of the probate court of Warren county was offered, showing the proceedings in the matter of guardianship of Mary, Florida, and Virginia Folkes. The prisoner, in November, 1836, took letters of guardianship, of these three children, (minor heirs of Henry Folkes, deceased), in right of his wife, widow of said Henry and mother of the children. In February, 1837, the prisoner presented his annual account as guardian, in which he charged each of his wards $144 a year for board; besides separate charges of their clothing. In August, 1837, he applied

by petition to the probate court, to sell the slaves of his wards, six in number; aged 20 years, 16, 13, 5, 4, respectively, and one 10 months. He states in his petition that it would be greatly to the benefit of the heirs to sell the slaves, and that if the order were granted, he would maintain and educate the minors at his own expense until they attained an age when they could maintain themselves. The sale was ordered on a credit for twelve months, and at January term he reported it; amounting to about $4,000, of which $1,115 belonged to Mary. At same term, in his annual account as guardian, he charged each of his wards $144 a year for board, which was allowed. At March term, 1840, he gave a new guardian bond. At March term, 1841, he presented another annual account showing amount in his hands, and which he was to retain, and pay lawful interest for it. At November term, 1842, filed his petition, stating that he educated, boarded and clothed the children, and in consideration thereof asked to be exonerated from payment of interest; this was granted. At February term, 1845, reported to the court that he held the ward's money in his hands, neither paying interest nor charging board, etc. At May term 1845, on his own petition showing that circumstances connected with the guardianship were of such a nature as to compel him to relinquish it, and that he was in the jail of Warren county, and was unable to say when his confinement would end; court discharged him from his guardianship. This is the substance of the whole record. The defendant objected to the admission of the record as illegal and incompetent, but the court overruled the objection, it was read, and the exceptions taken.

Samuel Luckett was then called for the state, who testified that Mary Folkes was half sister of his wife; and was asked by the prosecution, "Please tell whether or not, you last fall, or at any other time, offered Mary Folkes a home at your house, or authorized your wife to do so; if so, state in what manner and when." This was objected to, allowed, and exceptions taken. "The witness stated that he had authorized his wife to offer Mary Folkes a home in his house, and proceeded to state the reasons which induced him to do so, and which he stated to his wife;" "to which testimony, as to the reason, etc., of the wit-

ness, the prisoner's counsel objected," but it was admitted and exceptions taken.

The prosecution then asked, " From your knowledge of Mary Folkes, has she maintained the reputation of a lady of good fame ?  This was also objected to, and being admitted, exceptions were taken.  Witness answered, "she has, and he had heard several ladies speak well of her."   This was also objected to.

Benjamin Folkes, brother of Mary, called by the prosecution, stated that on the 9th or 10th of April, 1845, prisoner told him he had taken Mary Folkes to Hendersonville, Ky., and left her with a Mrs. Taylor, a relation of his ; witness went to Hendersonville, and not finding her there, returned to Vicksburg, where, learning from another source, that his sister was at Newburgh, Indiana, he went for and found her with the prisoner's brother-in-law, and brought her back to Vicksburg.   This was objected to, but admitted, and exceptions taken.

Miles C. Folkes, on the part of the state, said Mary Folkes was his half sister by the same father; prisoner married Mary's mother in 1835 or 1836 ; he was then asked, " After the prisoner married your step-mother, on what terms was the intercourse between him and the half-brothers of Mary Folkes regulated, whether friendly or otherwise ?"   Exceptions were taken to its admission, and he answered that until the year 1842, it had not been cordial, but since that period it had been of a social and friendly nature.   Witness also stated the conversation he had with his brother when he first heard the rumors about his sister's condition, and the language of rebuke to the persons who first communicated it.   These conversations and language are not inserted in the record, but their admission was made the subject of exception.   Same witness detailed the interview between his brother Benjamin and himself, as to the reports in circulation about their sister, and only of putting a stop to them ; also of facts relative to his brother's trip to Hendersonville, and Indiana and the reasons which led to it.   These conversations, etc., are not set out in the record, but were admitted to the jury, and excepted to.

James C. Goodwin, stated that Bullitt was the brother-in-law

of Toumey, prisoner, etc., had at one time worked in the witness's shop; and stated the history of some tools belonging to witness, which had been found in Bullitt's chest, and the conversation between Toumey, Bullitt and witness about them. This conversation was also made the subject of an exception.

William T. Martin, on the part of the state, testified that the general reputation and standing of Mary Folkes was as good as that of any girl; her associates and her character were good; he never heard her chastity or truth questioned.

The prisoner's counsel asked the witness if he knew the general reputation of Miss Folkes for veracity; witness responded, that he had never heard it spoken of, or called in question; the question was repeated, and a similar reply given. Prisoner's counsel insisted on a more distinct and direct answer being given, but the court decided the reply to be sufficient, and exceptions were taken.

*Foote & Hutchinson,* for plaintiff in error.

*John D. Freeman,* attorney general.

THACHER, J.:

An indictment for rape was preferred by the grand jury of Warren county against Isaac Toumey, at the April term, 1845, of the circuit court of that county. Under the statute a change of *venue* was allowed, and the indictment was tried in the county of Claiborne, whereupon a verdict of guilty was rendered, and the defendant sentenced to imprisonment in the penitentiary for the term of twenty years.

The defendant below brings the cause into this court by a writ of error, sued out upon exceptions reserved to the ruling of the court, in admitting and rejecting testimony upon the trial.

The first exceptions exhibited in the record relate to the mode of examination pursued with the witness for the state, Mary Folkes. This witness, having previously testified that about the first day of September, 1844, at which time she was just sixteen years of age, the defendant committed a rape upon her, was then permitted by the state to be asked upon her examination in chief, this question: "If Mr. Toumey then, or at any subsequent time, said anything to you in relation to this matter to dissuade you

from disclosing it? State when, where and what he said."
Again, the witness having testified that she was the defendant's
step-daughter, and had lived with him as her guardian from the
age of eight or nine years to the year 1842, during which time
he had treated her very affectionately, was also permitted to be
asked by the state : " If, in any of his antecedent conversations,
he (Toumey) offered property, or any other advancement to you,
in order to attach him to you, say so ?" Again, the following
question was permitted to be put to the same witness : "If, at
any time, subsequent to the transaction, he (Toumey) said any-
thing about what punishment the laws of Mississippi would in-
flict on him, or you, or both?—state it all." These questions
were answered affirmatively.

It is well settled that in the inquiry into the nature of a tran-
saction, whatever was said by both parties, as well as what was
done during the continuance of the transaction, is admissible.[1]
Roscoe's Cr. Ev., 22. But in this case the objections are directed
to the form of the questions, upon the ground of their being
*leading questions.*

It is often extremely difficult to distinguish such questions as
should not be allowed because of their leading tendency, from
those which, though in form leading, in effect only draw the
mind of the witness to the subject of inquiry. But, while it is
impossible to lay down any fixed rule, which will serve in all
cases, there are yet certain established rules upon the subject of
leading questions, which afford a good test by which to discrim-
inate in cases not very doubtful. For instance, that is a leading
question which suggests to the witness the answer desired.[2] 1
Stark. Ev., 124; 2 Phill. Ev., 722; The People v. Mather, 4
Wend., 249. And that is also a leading question which assumes
a fact to be proved, which is not proved. A question is also
leading which, embodying a material fact, admits of an answer
by a simple negative or affirmative. The latter constitutes an
argumentative or pregnant cause of interrogation, which the law
holds objectionable.[3] 1 Greenl. Ev., § 434.

[1] See 1 Archbold Cr. Pr. & Pl., 577.
[2] 1 Greenl. Ev., 434, 435, 437; Hill v. Coombe, 1 Ev., 163, note qq; Hanley v.
Ward, ib.; Roscoe Nisi Prius Ev., 171; 2 Phill. Ev., 888-889; Roscoe Cr. Ev., 130,
*et seq.*
[3] See note 2 supra.

On the other hand, however, there are exceptions to the rule,[1] which forbids leading questions to be put to a witness in his examination in chief; as when he is manifestly reluctant and hostile to the interest of the party calling him,[2] or when he has exhausted his memory[3] without stating the particulars required, where it is a proper name, or other fact, which cannot be arrived at by a general inquiry, or when the witness is a child of tender years, whose attention cannot be otherwise called to the subject matter.[4]   Moody v. Rowell, 17 Pick., 498.

It is also to be observed upon this subject, that much discretion is confided to a court in regulating and controlling the examination of witnesses, which is to be governed by the circumstances of each case;[5] and that some courts have gone so far as to hold that the subject, under what circumstances a leading question may be put, is a matter resting in the sound discretion of the court presiding over the examination, and is not a matter upon which to base a motion for a new trial, or which can be assigned for error.   Greenl. Ev., § 435; 17 Pick., 498; Stratford v. Sanford, 9 Conn. R., 275.

In order the better to scrutinize the character of the questions propounded in this case to the witness, Mary Folkes, we must bear in mind the state of the evidence at the different periods when they were severally proposed to her.   Before the first question now objected to was asked, it had been shown that about seven months had elapsed between the time when the act of violence was alleged by her in her testimony to have been committed, and the finding of the indictment, which, for all that appears, was the first disclosure of the offense charged.   It was, therefore, a material fact for the state to explain satisfactorily the cause of this long concealment by Mary Folkes, of the enormity alleged to have been perpetrated upon her.   A sufficient

[1] Stringfellow v. State, 26 Miss., 157; Gunter v. Watson, 4 Jones, 455.

[2] Bank of Northern Liberties v. Davis, 6 Watts & Serg., 285; Towns. v. Alford, 2 Ala., 378; 1 Greenl. Ev., 434–5, notes.

[3] Huckins v. People's M. F. Ins. Co., 11 Foster, 238.

[4] People v. McNair, 21 Wend., 608.

[5] Colclough v. Rhodes, 2 Pick., 76; Sears v. Shaffer, 1 Barb., 408; Donnell v. Jones, 13 Ala., 490; West v. State, 2 N. J., 212; Gayle v. Bishop, 14 Ala., 552; State v. Lall, 37 Maine, 246; York v. Pease, 2 Gray, 282; Budlong v. Van Nostrand, 24 Barb., 25; Walker v. Dunspangh, 20 N. Y., 170; Green v. Gould, 3 Allen, 465; Steer v. Little, 44 N. H., 613; Barton v. Kane, 17 Wis., 122.

explanation of this long silence might be established by proving
that the defendant dissuaded the witness from disclosing the
deed by promises or threats, or altogether prevented it by a re-
moval from her friends. It had already appeared in evidence,
that, from year to year from a very early period of the orphan-
age of the witness, he had with constant assiduity insinuated
himself into her confidence, and it was fair to presume that by
the accomplished arts of such a deliberate scheme of remorseless
and calculating villainy, he had succeeded in becoming the mas-
ter and tyrant of her mind, and rendered her the slave either of
his promises or threats. Under these circumstances, the witness
is asked to reply whether the defendant dissuaded her from dis-
closing the act, and also whether he informed her what punish-
ment the laws of Mississippi would inflict upon either or both
of them in consequence of it. It is clear that both of those ques-
tions embody a material fact in the case, and are capable of a
conclusive answer affirmatively or negatively. They are likewise
interrogatories pregnant with circumstances indispensable to be
proved for the success of the prosecution. Had the witness
simply rejoined that the defendant did dissuade her from dis-
closing the matter, and did inform her that the laws of Missis-
sippi affixed a punishment upon her for her part in the transac-
tion; such answers, in view of the high degree of abused con-
fidence already shown to repose in the mind of the witness
towards the defendant, must have most satisfactorily accounted
for the long delay in bringing the dark atrocity to the exposure
of light. But, while the principle of law fortunately is fixed,
that it being often necessary, it is, therefore, admissible to bring
the mind of a witness into contact with the subject of inquiry,
especially when a witness is examined as to any conversation or
admission; still it is also a principle of law equally fixed, and
beyond the control of the indignation of public justice, that, in
such questions, the witness should not be prompted to give a
particular answer, or be asked any questions to which the
answer "Yes" or "No" would be conclusive. 1 Stark. Ev.,
124; Nicholls v. Dowding, 1 Starkie's C., 81; opinion of Lord
Ellenborough. It is undoubtedly more convenient to ask a
witness whether such a thing was said or done; and questions so

framed might, in many cases, be asked without danger of perjury, even involuntary, and we do not deny that such was the result in the very case under consideration; and there are also instances when such leading questions are proper, as have been before alluded to; but, in ordinary cases, it is certainly most consistent with fairness and justice, both to the witness and the defendant, to ask the witness *what* was done, and *what* was said, rather than whether a particular and material thing was done and said. We are compelled, therefore, to the conclusion that the questions propounded to Mary Folkes, and which have been examined, conform to the legal definition of *leading questions.*

It comes next in order to inquire whether there were any of those peculiarities surrounding this witness which warranted leading questions to be asked in the direct examination. It does not appear that the witness was hostile to the interests of the state in the prosecution. On the contrary, every witness so unfortunately situated as this one was, must be presumed, if supposed to indulge any sentiment upon the subject, other than a desire to simply state the facts of the occurrence, to entertain deep feelings of profound indignation and horror towards her violator. Keeping in mind that the witness had already deposed as to the perpetration of the actual violence at the point of time when the questions objected to were propounded, it necessarily became a subject of great moment to her reputation and good fame to vindicate her purity of mind and chastity of heart. It is not unreasonable to conceive that any one so unfortunate might be willing to adopt and assent to whatever might be suggested for her own benefit; and it is wisely provided, that whenever a witness, from peculiar situation, has, or upon interrogation, shows a bias in favor of the examining party, a court should prohibit leading questions, even upon cross-examination. Further, the facts sought to be obtained from the witness were not such as could not significantly be pointed to by general interrogations, or which could not have been extracted from the witness by a skillful and legitimate mode of interrogation. And lastly, upon this branch of the subject, while it may with propriety be inferred that the witness was very naturally confused, and perhaps confounded, by the peculiarity of her position, in being re-

quired to testify in public to facts so repugnant to female deli-
cacy, it yet appears that the most dreaded and abhorrent details
had been communicated; and it does not appear from the course
of examination that repeated unsuccessful efforts had been first
attempted in the proper mode to call forth what was supposed to
exist in point of fact.  In conclusion, nothing appears to show
that the purposes of justice required the exercise of the discre-
tionary power to vary the general rule controlling direct exam-
inations, but rather the contrary.

It having been determined then, that leading questions were
addressed to this witness, and that they were not essential to the
ends of justice in this substance, it remains solely to inquire in
this connection, whether this court will undertake to interfere
with the discretionary power which is admitted to subsist with
the courts who preside over the examination of witnesses.

It is true that it has been held in the *nisi prius* courts of
England, that the rules of evidence are exactly the same in civil
and in criminal cases, and that in both, it is in the discretion of
the judge how far he will allow the examination in chief of a
witness to be by leading questions, or, in other words, how far it
shall assume the form of a cross-examination.[1]   Regina v. Mur-
phy and Douglas, 8 C. & P., 297.   But the decisions above
quoted from this country, wherein it was held that the matter of
judicial discretion respecting the examination of witnesses, was
not such as upon which to base an application for a new trial,
or which can be assigned for error, were made in civil and not
in criminal cases.   Yet, in the case of Duncan v. McCullough,
Admr., 4 Serg. & Rawle, 482, which was a civil action, the su-
preme court of Pennsylvania admitting the rule, that the man-
ner of examining witnesses as a matter very much in the discre-
tion of the court presiding upon the trial, intimate that they
would entertain the question, whether that court would reverse
for error on a point in which the law permits the court below to
exercise their discretion, provided it appeared that there had
been any abuse of discretion.   In the case of The People v.
Mather, 4 Wend., 247, which was the case of an indictment for
a conspiracy in the abduction of William Morgan, the court,

[1] See note 11, p. 312; 1 Greenl. Ev., 435, notes ; Clarke v. Saffrey, Ry. & M., 126.

while it also admits the doctrine that considerable discretion is left to a judge who presides at a trial to control and regulate the examination of witnesses, and that appellate courts should cautiously avoid encroaching upon the proper exercise of this discretion, yet held, that if an established rule of law has been violated, the party injured has an undoubted right to belief, and that the court would feel no reluctance to grant it. The rule thus laid down by the Supreme Court of New York seems most consonant to the object of public justice, which is more the protection of the innocent than the punishment of the guilty.

Upon other points relied upon in the case, it now becomes necessary to speak but generally.

In regard to evidence of the actual guardianship of the defendant over the person of Mary Folkes, the chief witness, it was, perhaps, only necessary to have produced the copy, or a certificate of the grant of letters. This would have been enough to have established the existence of such guardianship during the minority of the ward, unless 'the contrary was made to appear by proof of a resignation or removal from the trust. Yet, I am not prepared to say, that the state could not be permitted to anticipate any such presumption, and establish the continuance of the guardianship up to any period necessary to be shown by means of the records of the probate court granting the letters.

Evidence was introduced as to the good fame of the person violated. This was competent, because she was made a witness in the cause. The party ravished is a competent witness to prove the fact, but the credibility of her testimony must be left to the jury. It is legitimate to support her credibility by evidence of her good fame, or to attack it by evidence of her evil fame. Such evidence tends to show that the connection with the woman was had against or with her consent. 4 Bl. Com., 213.

In consequence of the inadmissibility of the questions propounded to the chief witness, and the objection to them by the defendant upon the trial below, the judgment must be reversed, and a new trial awarded by the circuit court of Claiborne county.

SHARKEY, C. J., *dissenting :*

I concur in the opinion, that there was an error committed in

permitting leading questions to be asked and answered, and as the question is one of great importance in the present case, I will briefly state some of the grounds on which my conclusion is based.  It is very clearly laid down by elementary writers, that leading questions, that is, such as instruct a witness how to answer, are not allowed on the examination in chief, because by directing witnesses in their evidence, the bias which they generally feel towards the interest of the party who calls them, would be strengthened.  The strictest observance of this rule is said to be necessary for the discovery of truth and the administration of justice.  1 Phillip's Evidence, 268.  Starkie says, that the principal rule to be observed upon the examination in chief is, that *leading questions* are not to be asked; that is, questions which suggest to a witness the answer he is to make; he also says, that objections to questions of this nature are of the highest importance.  1 Starkie, 123.  But a witness may be examined in an introductory manner, so as to lead his mind to the subject; hence it is often difficult to decide whether a question propounded is objectionable.  These questions resemble so much the question which was decided to be objectionable as a leading question, in the case of Courteen v. Touse, 1 Camp., 43, as to entitle them to be held liable to the objection.  The rule against the admissibility of leading questions is said to be most important, when the question is asked in reference to any conversation, admission, or agreement, as there is danger, that the witness should by design or mistake be guilty of some variance, and give a false coloring to the transaction.  Again, there are cases, in which leading questions will be allowed.  The instances given are, where the witness appears to be in the interest of the opposite party, or unwilling to give evidence, or when he is so young, that it is necessary, to enable him to understand the subject.  If the rule is to be relaxed in cases of this kind, it must be enforced with more strictness, when a willing witness is to be examined.  Whilst it may be relaxed in the case of an unwilling witness, for the purpose of extracting truth, it must be rigorously enforced against a willing witness, for the purpose of suppressing falsehood.  The reason of this rule seems to be, that a bias is supposed to exist in the mind of the witness towards the

party who calls him. If such a supposed motive has been deemed a sufficient foundation for the rule, then, if there be palpable additional motives, the rules must acquire a corresponding importance, and require to be more rigidly enforced. If the law does not allow a leading question to be asked, merely because of a supposed bias on the mind of the witness, arising from the circumstance that he was called by the party for whom he is about to testify, where there are considerations and motives personal to the witness, the danger of perjury is increased tenfold, and leading questions become too manifestly improper. Was there any such thing as a personal motive to operate on this witness? The crime had been perpetrated on her seven months before it was disclosed, a circumstance powerfully calculated to induce suspicions, that she had been a willing victim to the perfidy of a seducer, rather than a resisting subject of a brutal outrage. Those suspicions were fatal to her character. Her good name was at stake; it was necessary to redeem it from the imputation of unchastity; this could only be done by giving some plausible excuse for the unaccountable delay which had preceded the disclosure; the question suggested the means of escape; it led to an answer, which might account for that delay, and save the reputation of the witness. When the motive to commit perjury is so powerful, the strictest administration of the law is necessary, and even that may fail to prevent it. This witness must have been fully aware, that her long silence would operate against her character, by causing a belief, that she had yielded to importunities, and she must have felt a deep interest in removing such belief. Under circumstances like these, it was peculiarly improper that leading questions should be asked. I think it more than likely, that the witness told the truth, but that does not alter the case. The law must so operate as to meet all contingencies, and other witnesses under similar circumstances, to whom the rule would equally apply, might be induced to swear falsely. It would be tolerating a temptation to commit perjury. Besides the motives which may have operated on the witness, these questions were put in reference to conversations, admissions, and agreements of the accused, in which cases it is said in the books, the rule must be strictly enforced.

But it is said to be within the discretion of the court, before which the examination is had, to allow leading questions to be propounded or not, and that it cannot be assigned as error. The authorities on this subject are contradictory; by some it is holden to be error, by others it is said to be a matter of discretion. It is of the greatest importance in legal proceedings that truth should be ascertained, and this is one of the rules that the law employs to reach that end; it is said to be a rule of the highest importance, and that the strictest observance of it is essential to the discovery of truth and the due administration of justice. It seems to involve a contradiction to hold, that the rule is so important, and at the same time to hold, that it rests solely in the discretion of the court before which the examination takes place. If it be so important for the discovery of truth and the administration of justice, every means should be allowed of enforcing it. The exceptions to the rule show, that it is in some instances a rule of discretion, but they by no means prove, that it is always to be so regarded. Leading questions may be asked a reluctant witness or one who seems to be in the interest of the opposite party, or one who is so young as to make it necessary. In such cases the court has a discretion. If, in the opinion of the court, the witness testifies reluctantly, or seems to favor the interest of the opposite party, leading questions may be allowed. The court, in its discretion, is to judge of the necessity for such questions. In this we perceive the reason for classing it as a rule of discretion. But is it still a rule of discretion, when it is manifest that the witness favors the party by whom he is called? It would seem not. The discretion is to be exercised in deciding when the questions of a leading character are to be permitted, but when it is perfectly manifest that they are not necessary, then the court has no discretion; it must prohibit them. This is a matter which cannot, in many cases, be made to appear in an appellate court; and hence it is often said to be matter of discretion to allow such questions or not. But there are cases in which the record will enable the appellate court to judge of the necessity or impropriety of such questions. When it is perfectly manifest from the language of the witness and from the relation which he bears towards the person against

whom he is testifying, that he is and must be hostile to the interest of that party, and must, in the nature of things, desire that the verdict should be against him, then leading questions are certainly improper, and if such a state of things is exhibited by the record, it must be competent for an appellate court to correct an error which has occurred by permitting leading questions to be asked.  Under such circumstances the court has no power to allow a leading question to be asked; the law forbids it; and if it should be allowed, is an abuse of discretion, and if the facts can be made to appear in the appellate court, the error may be corrected.  It is because the appellate court cannot, as a general rule, be advised of the temper of the witness, of his bearing and manner, that it will not undertake to control the court below in the matter of leading questions.  But where it can be fully informed, where the record furnishes the means of judging of the propriety of such questions, I see no reason whatever why the appellate court should not exercise its judgment.  It would seem to be peculiarly proper that it should do so, when a rule, confessedly important for the discovery of truth and the due administration of justice, has been violated.  Now what is the state of facts exhibited by this record?  They need not be repeated.  It is perfectly apparent that the witness was not favorably disposed towards the prisoner.  In the nature of things she must have desired his conviction; she was not reluctant to testify against him.  Of these facts we are fully informed by the record, and therefore capable of judging of the propriety or impropriety of leading questions.  As a general rule, I would admit that leading questions are to be regulated by the discretion of the circuit court; but when it is apparent that there was a powerful motive personal to the witness, beyond the mere bias supposed to arise in favor of the party who calls the witness, and where it is also apparent from the record that there was no necessity for allowing leading questions to be put, but, on the contrary, powerful reasons why they should not have been allowed, then I shall be willing to hold that it is a matter which may be assigned as error; then the error can be shown, and ought to be corrected.  I would also advert to the fact that the legislature has gone very far to limit the discretion of the circuit courts

over the evidence given at the trial, by allowing parties to re-
duce the evidence to writing, and take appeals from motions for
new trials.

But to my mind this record exhibits other errors, on which a
judgment of reversal may rest with even less doubt than that
above referred to.   After the witness, Mary Folkes, was ex-
amined, the state introduced a transcript from the records of the
probate court, of Warren county, containing the appointment
of the accused as guardian of Mary Folkes and her two sisters,
and exhibiting every step taken in the progress of guardianship,
and every order of court made in relation thereto, beginning in
November, 1836, and ending with his removal, in May, 1845.
It contains his annual accounts which specify every item charged
to each of his wards, and every order of the court made in relation
thereto.   It contains the petition of the accused that he might
be permitted to sell all the slaves of his wards, on pretence that
it be for their benefit, and the order of court granting the peti-
tion, and also the return of sales.   It is but too manifest that
the sale was to their prejudice.   The slaves were but few in
number, and mostly young and valuable.   No good reason was
shown for the sale, but still the court allowed it under a promise
tendered in the petition, that the accused would support his
wards at his own expense.   But when the sum of $4000 came
to his hands, we find him violating this pledge by asking to be
permitted to hold it without interest, on the ground that he was
sending the girls to school.   This record then exhibits his solemn
pledge and his violation of that pledge.   It also shows that his
surety became alarmed, and he was cited and required to give
other sureties.   He was formally removed, but the money of his
wards was not accounted for; that was doubtless squandered;
at least it was not surrendered.   The witness was not only de-
spoiled of her virginity, but of her fortune also.   What but
prejudice could be excited by an examination of this record, in
connection with the facts before the jury; and what had these
proceedings to do with the issue before the jury.   Was it neces-
sary that the jury should know how he had managed the estate
of his ward, in order to enable them to determine whether he
had committed a rape on her?   Even if this record did not ex-

cite a prejudice, still it was so much irrelevant matter. The prisoner had a right to have the whole mind of the jury directed and confined to the single inquiry of guilty or not guilty. But instead of that their attention was divided and directed to an examination of his management as guardian. They could but see that he had contrived to cheat his wards out of their property. It will not do to urge the necessity of this whole record as proof; it was not necessary. If it was necessary to prove the fact that he was guardian, which I admit it was competent for the prosecution to do, a mere extract from the order of appointment, or a certificate from the proper officer that he had been appointed, was all that was necessary. This is the way that the appointment of an administrator is proved, and it is all that is necessary. 1 Phillips Ev., 398. A party cannot introduce the various settlements with the probate court in reference to a particular estate, and the orders made by the court during a period of nine years, merely because a single entry happens to be an important item of proof. It was not necessary to introduce this record to prove that he continued guardian. It followed as a necessary presumption from his appointment, that he continued guardian, as a guardian is appointed to continue in office during the minority of his ward. In any point of view, then, this record seems to me to have been inadmissible. If it contained matter that was calculated to excite a prejudice, without having any bearing on the issue, it was of course inadmissible; and if it contained matter apparently innocent, if it was irrelevant, it was inadmissible.

I also think that the examination of Samuel Luckett was foreign to the issue. This question was propounded to him: "Please tell whether or not, you, last fall, or at any other time, offered Mary Folkes a home at your house, or authorized your wife to do so? if so, state in what manner and when." We are informed by the bill of exceptions, that the witness answered in the affirmative, and proceeded to state the reasons which induced him to do so, and which he stated to his wife; but the language of the witness is not given; it is therefore difficult to show its objectionable character; but this much I am free to say, I cannot imagine any possible motive which dictated the conversation be-

tween the witness and his wife that would have been proper as evidence, or that could justify the admission of the conversation which passed between *them* as evidence.   Such conversation was not part of the *res gestæ*, but it seems to have been a disclosure of reasons which prompted the witness to offer Mary Folkes a home at his house.   If a conversation held between the witness and his wife, the prisoner not being present, was admissible as evidence in this trial, it would seem to be difficult to say what would not be admissible.   There is other testimony of the same character.   M. C. Folkes was called as a witness, and proceeded to state a conversation which passed between him and his brother in reference to Mary Folkes.   This conversation is set out in the bill of exceptions, and speaks its own condemnation.   If it was admissible, there seems to be no limit to the admissibility of conversations between third persons.   On the whole I am of opinion that the judgment should be reversed, and a new trial awarded.

CLAYTON, J.

I cannot concur in the reversal of this cause.   I am not satisfied that the questions considered objectionable fall within the class of questions denominated leading.   I fully concur with the court in Mather's case, 4 Wend., 247, " that it is often a matter of extreme difficulty to distinguish such questions as ought not to be tolerated, because they are leading, from those which, though in their form leading, are in effect only calculated to draw the mind of the witness to the subject of inquiry."

This difficulty is very apparent, from the various definitions or descriptions which have been attempted of leading questions. The most usual definition is, that they are those which may be answered by a mere affirmative or negative, and in which consequently the answer is fully suggested by the question.   Another is, that they embody a material fact, and admit of an answer by a simple negative or affirmative.   Another, that the question propounded involves an answer bearing immediately upon the merits of the cause, and indicating to the witness a representation which will best accord with the interests of the party.   Two other objections to questions are likewise stated in

the books, though they do not partake of the character of leading questions. One is, that an argumentative or pregnant course of examination is as faulty as the like course in pleading; the other, that the interrogatory must not assume facts to have been proved which have not been proved. 1 Greenleaf, § 434; 2 Pothier on Ob. by Evans, 203, 205.

Tried by any or all of these tests, and the questions in this case are not *clearly* and *certainly* objectionable. The first of them was this: "If Mr. Toumey, then or at any subsequent time, said anything to you in relation to this matter to dissuade you from disclosing it, state when, where and what he said." This could not be answered by a simple negative or affirmative, nor does it suggest to the witness the answer which is desired. The objection presupposes, or it is of no force, that the witness is ignorant, and would not, without prompting in some shape or other, know how to tell a story or frame an answer that would be favorable to the party for whom he is called. It will require no little sagacity to discover from this question any representation which will not best accord with the interests of the party. Unless the mind of the witness had been previously directed to this point, and unless she had learned the necessity of explaining away her silence, this question could not have instructed her what answer to give. If she had been previously crammed for the occasion, the question was harmless, and the utmost latitude of cross-examination was allowable to detect and expose the fact that it was a fabricated tale. The witness no doubt stood in a suspicious attitude; she must have felt a deep interest in the result, and the jury had a right to take into view all these considerations, and to receive her testimony with allowance. But when all this is conceded, I cannot see that this question suggested what answer she was to give, or put words into her mouth which she was to echo back again.

The next question was this: "If in any of his antecedent conversations he offered property or any other advancement to you, in order to attach you to him, say so." It is not easy to see how this question could have assumed a less exceptional shape. All the authorities say, you may bring the mind of the witness to the precise point, about which you wish to inquire.

Could this have been done in a less objectionable mode ? The last question was this : " If at any time subsequent to this transaction, he said anything about what punishment the laws of Mississippi would inflict on him, or you, or both, state it all." This question is perhaps more free from objection, than either of the others.  In one sense all questions are leading, they point the attention of the witness to the subject about which he is requested to testify.  Judge Cowen, in his notes to Phillips on Ev. after a careful review of the subject, thus states the general rule : " In cases of conversations, admissions and agreements, you may draw the witness' attention to the subject, occasion, time, place, person and ask directly, whether such a person said anything on the subject thus brought under attention ; and if yea, what did he say," Vol. 2., p. 724.  These questions in my view, do not fall under condemnation by this rule.

In Watson's case, 3 C. L. R., 280, it was held, that the prosecutor might point to the prisoner, and ask the witness, if he were the person meant.  In the case of the People v. Mather, 4 Wend., 247, the question objected to was, " how did you address the defendant in respect to his being one of the persons concerned," in the abduction of Morgan ?  The court said, " this question assumes the fact as true, which it was the object of the question to prove.  It assumed that the witness did address the defendant, as one of the persons concerned in carrying off Morgan, and only asked him to tell the manner of the address." Now the questions were to be regarded as leading, their admission rests in the sound discretion of the court, and is not error, for which a reversal can be had.  There is not in the English books, so far as I have seen, and none certainly was produced upon the argument, a case in which such objection has been taken in the appellate court.  Every one, that I have been able to find, occurred in the progress of the trial at *nisi prius,* and was put finally to rest by the judge who presided.  Greenleaf and the American editors of Phillips on Evidence, lay down the rule, that it is a matter resting in the sound discretion of the court, and which cannot be assigned for error. 1 Greenl., § 435 ; 2 Phill., 725.  This rule is distinctly recognized in Stratford v. Sandford, 9 Conn., 275, and in Moody v. Rowell, 17 Pick., 498.

It is true, that in the case of The People v. Mather, 4 Wend., 247, a different rule is propounded. Indeed, there are but few points in the whole circle of the law, on which conflicting opinions of American courts may not be found. In all such instances of conflicting opinions as to the common law, the only true source to which we can resort for a resolution of doubts in the English authorities, and in them, this point seems never to have been urged as a ground of error.

All the writers, admit, that the asking of a leading question, rests in the sound discretion of the court, in which the trial is had. It is a settled principle of common law, that the exercise of discretionary power, is not in general, if indeed under any circumstances, a matter examinable upon a writ of error. Comyn. Dig. Error A.; Barr v. Gratz, 4 Wheat. 213. There may be exceptions, to which reference will hereafter be had; but this court has repeatedly recognized this as the general rule. Because this was the law, the legislature of this state enacted that a writ of error, should lie, for the granting or refusing a new trial. Before this statute, that was a matter resting in the sound discretion of the court, which tried the case, and was not ground of error. The legislature has passed other acts trenching upon the discretionary powers of the courts. These acts must be obeyed; but it does not thence follow, that the restriction is to be carried beyond the limit indicated by the legislature. I have just stated, that there might be exceptions to this rule; though many courts have refused to allow of any. I think it safer to admit, that the wrong exercise of legal discretion may be matter of error, "but the error must be gross and palpable, and not subject to hesitation or doubt; and must have produced flagrant and oppressive injustice." This is the language of the cases, Smith v. Britton, 4 Hump., 202; People v. Mather, 4 Wend. 247; 5 Hump., 568; 2 Rob. Va. Rep. 849; 10 Leigh, 692.

This case does not fall within such rule. It is matter of much doubt, whether the questions are liable to the objection at all. The books lay down various cases, which constitute exceptions to the general rule as to leading questions, and in which they are admissible. One of these is, when the witness is a reluctant

one as to the party calling him, or manifests a bias against such party. All the evidence in this case is not set out; it is impossible then for this court to know whether the witness was willing or reluctant, or whether the state of the case did not exist which authorized such mode of interrogation. The manner and bearing of the witness cannot be transferred into the bill of exceptions. The presumption is in favor of the acts of the court below. If in one state of circumstances the question was proper, and in a different state improper, and if this court has not the means to determine which was the true state of the case in this instance, this presumption sustains the decision of the court below. We cannot reverse unless we see there is error.

In most cases of exceptions, the objection is to the *answer*, not to the interrogatory. The court excludes or admits the answer, as may be right. But here the objection is to the *question*, because it may teach the witness, what answer to give. It subjects him to suspicion. The objection goes not to the competency, but to credibility of the witness. For, if he means to tell the truth, the mode of examination will not induce him to tell a falsehood. Starkie says, " that answers extracted by such improper means, are of little advantage in general to the party, in whose favor they are given, since evidence, obtained from a partial witness, by unfair means, must necessarily be viewed with the utmost jealousy." " Such evidence is very unsatisfactory, and open to much remark." 1 Starkie, 150, 162. It is the province of the jury to decide upon the credibility of the witness, and no court can invade that province. Yet, I cannot see how a judgment is to be reversed because a leading question is asked, without infringing the right of the jury to determine upon the credibility of all testimony. If the question be not answered, all will agree that it will do no harm; if it be answered, it is only objectionable because it may lead the witness to tell an untruth. Whether he does so or not, is matter for the jury, and it seems to me, that by reversing a judgment for this reason, we place ourselves in the proper position of the jury.

It has been shown that the erroneous exercise of a discretionary power by a court will not be ground of reversal, unless it be productive of flagrant and oppressive injustice. Is the asking

of a leading question likely to work such a result? Starkie says, they are of little advantage to the party. Mr. Evans, in his edition of Pothier on Contracts, lays even less stress on them. Vol. 2, p. 203. Lord Ellenborough said, " If questions are asked, to which the answer yes or no would be conclusive, they would certainly be objectionable, but in general, no objections are of less moment than those which are made to questions as leading ones." Nicholls v. Dowding, 1 Starkie, N. P. C. 81; 2 Com. Law Rep., 305. It is not probable, therefore, that injury or injustice was done to the prisoner by these interrogatories; and it would extend the rule beyond the limit indicated in any case, that I have seen, so to hold.

This point was the one mainly discussed in the argument, and after having bestowed so much time upon it, I shall dwell but briefly upon the others.

The record of the probate court perhaps contained some matters which were irrelevant. Parts of it, however, were clearly legal and proper testimony; indeed the only legitimate testimony of facts which it was important to establish. The counsel for the prisoner did not move for the exclusion of those parts of the record which they deemed objectionable, but of the *whole*. This motion could not have been sustained, because a part was clearly legal and necessary proof. As to the presumption, that when the guardianship was once established, it continued until its determination was shown, the reply is, that a party cannot be required to rest his case upon presumptions, when he has positive proof in his power. On this point I concur with Judge Thacher.

In regard to the other exceptions, a few words will form my answer to them all. They all rest upon the ground, that the testimony offered was irrelevant, and ought not to have been admitted.

This court has decided, on more than one occasion, that although testimony ought, in strict practice, to appear to be irrelevant at the time it is offered, yet if it appear to be so at any time during the trial, it is sufficient. If it do not, then it should be excluded, when the testimony is closed. Lake v. Munford, 4 S. & M., 312.

The bill of exceptions in this case does not purport to set out

all the testimony; there was at the close of the testimony no motion to exclude that in question, nor any motion for a new trial. It was an important point upon the part of the prosecution to account for the long silence of this ruined girl. To do so, it might have been important to unravel the web of cunning and falsehood, by which the prisoner, after having spoiled her of all that gives pride and purity to womanhood, had made her the slave of his will, and to conceal his guilt, had removed her to a distance from her friends and counsellors. The testimony excepted to might have been relevant and pertinent for that object. It was manifestly introduced for that purpose. If it were not pertinent, the bill of exceptions should have disclosed the whole evidence, and furnished the means of determining its propriety, in connection with all the proof, not on partial and garbled extracts. An exception for the exclusion of testimony rests upon a different footing. Worten v. Howard, 2 S. & M., 530.

It is my conclusion, that if there be error, the judgment is irreversible, because the record does not furnish the necessary means of enabling us to decide whether the evidence was irrelevant.